**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

15 CV 384

-----------------------------------------------------------x

DREW DOSCHER,

                Petitioner,

    -against-

SEA PORT GROUP SECURITIES, LLC,
STEPHEN SMITH,
MICHAEL MEAGHER,
MICHAEL MEYER,
THE SEAPORT GROUP, LLC,
ARMORY ADVISERS, LLC,
ARMORY FUND, LP, and
SEAPORT V, LLC,

                Respondents.

-----------------------------------------------------------x

Civil Action No. CV _____

**PETITION TO VACATE**
**AND MODIFY**
**ARBITRATION AWARD**

**Oral Argument Requested**



Pursuant to Section 10 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1,

*et.*seq., Petitioner DREW DOSCHER ("Doscher"), by and through his attorneys, Merolla

& Gold, LLP, seeks to vacate in part, and modify in part, the arbitration award issued in

*Doscher v. Sea Port Group Securities, LLC, et.al.*, FINRA Case No 13-01857, which was

filed and delivered by FINRA on October 22, 2014 (the "Award"). The Award is Exhibit

1 to the accompanying Declaration of A. Todd Merolla dated January 19, 2015 (the

"Merolla Dec."). http://finraawardsonline.finra.org/viewdocument.aspx?DocNB=65263.

**PRELIMINARY STATEMENT**

1.      This Petition is not aimed at the entirety of the Award. Rather, Doscher

seeks to vacate that portion of the Award related to his equity interest in The Seaport

Group, LLC and its affiliates ("Seaport"), his claim for declaratory judgment, a legal and

equitable accounting, constructive trust, and an alter ego theory of recovery on two

grounds. First, pursuant to 9 U.S.C. § 10(a)(3), insofar as the arbitrators refused to insure

that relevant documentary evidence in the possession, custody, and control of the

Respondents and their counsel were fully and timely made available to Doscher.  *Home*

*Indemnity Co. v. Affiliated Food Distrib.*, 1997 U.S. Dist. LEXIS 19741 (December 12,

1997 S.D.N.Y.).  Second, the arbitrators acted in "manifest disregard" of the law. *Jock v.*

*Sterling Jewelers*, 646 F.3d 113, 121-22 (2d Cir. 2011).

     2.     Doscher also seeks to modify that portion of the Award related to the

"specific performance" award for Silverpoint, pursuant to 9 U.S.C. § 11(a), as there was

an evident material miscalculation of the "50% payout to Claimant and co-covering

salesperson split equally."  There was no evidence in the trial record that there existed

any "co-covering salesperson" regarding the Silverpoint portion of the Fairfield Sentry

claim.  Doscher should be Awarded the entirety of the "50% payout" for Silverpoint.

     3.     Petitioner is cognizant there exists a strong presumption in favor of

enforcing an arbitration award, and that the policy of the FAA requires an award be

enforced unless one of the grounds listed in 9 U.S.C. § 10(a) are affirmatively shown to

exist.  *Wall Street Assocs., L.P. v. Becker Paribas Inc.*, 27 F.3d 845, 848 (2d Cir. 1994).

Section 10(c) is violated when the arbitrators fail to insure that relevant documentary

evidence in the hands of one party is fully and timely made available to the other, and

prejudice is shown.  *Home Indemnity Co. v. Affiliated Food Distrib.*, 1997 U.S. Dist.

LEXIS 19741 (Dec. 12, 1997 S.D.N.Y.), *citing Chevron Transport Corporation v. Astro*

*Vencedor Compania Naviera, S.A.*, 300 F. Supp. 179, 181 (S.D.N.Y. 1969).  When a

party's basic right to present and test evidence on issues has not been accorded, vacatur is

warranted pursuant to Section 10(c).  *Cofinco, Inc. v. Barkie & Bros.*, 395 F. Supp. 613,

615 (S.D.N.Y. 1975).

4.      In addition, the Second Circuit recognizes a judicially-created ground, when the arbitrators have exhibited a manifest disregard of law. *Porzig v. Dresdner, Kleinwort, Benson, North America LLC*, 497 F.3d 133, 139 (2d Cir. 2007). Determination of "manifest disregard" depends on the consideration of three factors: (1) whether the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators; (2) whether the law was in fact improperly applied, leading to an erroneous outcome; and (3) whether the arbitrators knew of the laws existence, its applicability to the case, and intentionally disregarded it. *Century Indem. Co. v. AXA Belgium*, 2012 U.S. Dist. LEXIS 136472, *34 (S.D.N.Y. Sept. 24, 2012). Ultimately, to warrant vacatur, arbitrators must appreciate the existence of a clearly governing legal principle but decide to ignore or pay no attention to it." *Id.*, at *34-35.

5.      In this case Doscher was simply not given a fair trial given the alarming number of instances in which Respondents and their counsel obfuscated the exchange of information and made outright misrepresentations regarding facts known to be true during discovery, which came to bear at the very end of a two week trial in September 2014.  In doing so, Respondents counsel Ronald G. Blum and Prana Topper committed a fraud on the tribunal.  N.Y. Jud. Law § 487.  The violations were conclusively proven during the final hearing, and the Arbitral Panel was aware of the applicable legal principles yet intentionally disregarded it.  Doscher was significantly prejudiced as a result, and there was no consequence for the contumacious behavior of the Respondents by and through their counsel regarding the violation of multiple discovery orders to produce documentation material to Doscher's claim regarding his equity interest in Seaport (the "Equity Interest"), and Respondents intentionally interfered with Doscher's

ability to get critical documentation and information from his own forensic accountants Sobel & Co., LLC ("Sobel & Co.").

6.      This case involves rampant discovery abuse by the Respondents, perpetrated by their counsel Ronald G. Blum and Prana Topper, which made intentionally false and deceptive statements to the Arbitral Panel both during discovery and during trial.  From the outset, rather than comply with FINRA Rule 13505 that requires "the parties must cooperate to the fullest extent practicable in the exchange of documents and information to expedite the arbitration," Mr. Blum and Ms. Topper engaged in a "scorched earth" strategy regarding discovery, resulting in two orders compelling the production of documents.  (Merolla Dec. Ex. 21 and 25).  The second of which was in conjunction with a request to postpone the scheduled final hearing dates in June 2014, to which Respondents objected.  Then at trial, after the misrepresentations were conclusively proven, the lack of compliance with prior discovery Orders were no longer contested, and the veracity of tendered documentation completely called into question, the Arbitral Panel refused to remedy the misbehavior in any manner, shape, or form either during the final hearing or in the Award.  Small wonder, after issuance of the Award, Mr. Blum told Bloomberg News:

**"We are very gratified by the panel's decision."**

Exhibit A, attached hereto.  No doubt, since if there are no consequences to obstructionist tactics, the delivery of false information, and fraudulent representations to a tribunal, why ever cooperate?

7.      Except that licensed attorneys have ethical duties both as an advocate and as an officer of the court.  Regarding discovery, in the spirit of the plain language of

FINRA Rule 13505 ("The parties must cooperate to the fullest extent practicable in the exchange of documents and information to expedite the arbitration"), which is akin to Rule 1 of Federal Rules of Civil Procedure, now retired Magistrate Judge Wayne D. Brazil from the Northern District of California previously opined:

> The discovery system depends absolutely on good faith and common sense from counsel. The courts, sorely pressed by demands to try cases promptly and to rule thoughtfully on potentially case dispositive motions, simply do not have the resources to police closely the operation of the discovery process. The whole system of civil adjudication would be ground to a virtual halt if the courts were forced to intervene in even a modest percentage of discovery transactions. That fact should impose on counsel an acute sense of responsibility about how they handle discovery matters. They should strive to be cooperative, practical and sensible, and should turn to the courts (or take positions that force others to turn to the courts) only in extraordinary situations that implicate truly significant interests.

*In re: Convergent Technologies Securities Litigation*, 108 F.R.D. 328, 331 (N.D.Ca. 1985) [emphasis supplied].

8.     More recently, Justice Mark W. Bennett from the Northern District of Iowa, sanctioned an attorney "with an outstanding career" for discovery abuse and observed:

> Discovery—a process intended to facilitate the free flow of information between parties—is now too often mired in obstructionism. Today's "litigators" are quick to dispute discovery requests, slow to produce information, and all-too-eager to object at every stage of the process. They often object using boilerplate language containing every objection imaginable, despite the fact that courts have resoundingly disapproved of such boilerplate objections. (Citation omitted). Some litigators do this to grandstand for their client, to intentionally obstruct the flow of clearly discoverable information, to try and win a war of attrition, or to intimidate and harass the opposing party. Others do it simply because it's how they were taught.

> …………………..

> But the litigators and trial lawyers do not deserve all the blame for obstructionist discovery conduct because judges so often ignore this conduct, (Citation omitted) and by doing so we reinforce—even *incentivize*—obstructionist tactics. (Citation omitted). Most litigators, while often inept in jury trials (only because they so seldom experience them), are both smart and savvy and will continue to do what has worked for them in the past. Obstructionist litigators, like Ivan Pavlov's dogs,

salivate when they see discovery requests and are conditioned to unleash their treasure chest of obstructive weaponry. Unlike Pavlov's dogs, their rewards are not food but successfully blocking or impeding the flow of discoverable information. Unless judges impose serious adverse consequences, like court-imposed sanctions, litigators' conditional reflexes will persist. The point of court-imposed sanctions is to stop reinforcing winning through obstruction.

*The Security National Bank of Sioux City, Iowa v. Abbott Laboratories*, 299 F.R.D. 595, 596-597, (N.D. Iowa 2014).

Not only are Justice Bennett's comments in the first paragraph applicable to Mr. Blum's and Ms. Topper's behavior in this case, his statements in the second paragraph are spot on accurate regarding the Arbitral Panel's failure to act.

9.      From February 2014 through May 2014, the parties engaged in significant discovery disputes that resulted in multiple orders being issued against the Respondents compelling them to produce:

(a) internal accounting records in native QuickBooks format;

(b) federal and state tax returns from 2009 through 2012;

(c) documents given to Doscher's personal forensic accounting firm from May through September 2012, Sobel & Co., prior to his termination as a Seaport employee on January 11, 2013.  (Merolla Dec., Exhibits 21 and 25).

10.      In addition, on <u>three occasions</u> Doscher submitted motions to permit and allow:

(a) the ability to receive the requested tax returns directly from the IRS through execution of Form 4506;

(b) the taking of pre-hearing depositions; and

(c) non-party subpoenas be issued for the production of documents.

Each and every time the Arbitral Panel denied those motions.  (Merolla Dec., Exhibits 15, 21, and 25).

11.     The final hearing occurred in September 2014, and included nine days of evidence and argument.  (Merolla Dec., Exhibits 27-35).

12.      On October 22, 2014, the Arbitral Panel filed and delivered the Award, whereby Doscher received compensatory damages of $2,289,774.00 and "specific performance" regarding a trade that has yet to settle.  Respondents' counterclaim was denied in its entirety.  Doscher's equitable claims for a declaratory judgment, an accounting, and a constructive trust were all denied, as was his motion for sanctions for discovery abuse, delivery of false documentation, and blatent misrepresentations to the Arbitral Panel.  (Merolla Dec., Exhibit 1).

## JURISDICTION/VENUE

13.     Plaintiff Drew Doscher (hereinafter, "Doscher"), is a New York citizen residing in New York County, New York.  As an Associated Person of a FINRA Member, Doscher was obligated to arbitrate his dispute with the Respondents within a FINRA arbitration.  FINRA Rule 13200.  Along with his original Statement of Claim, Doscher delivered a FINRA Arbitration Submission Agreement.  A copy of Doscher's Submission Agreement is attached hereto as Exhibit B.

14.     All Respondents delivered a FINRA Arbitration Submission Agreement regarding this dispute.  A copy of the Respondents' Submission Agreement, signed by Ronald G. Blum, Esq., of Manatt, Phelps & Phillips, LLP as counsel for and on behalf of the Respondents is attached hereto as Exhibit C.

15.     The original Arbitral Panel constituted of Chairwoman Michele S. Riley, David J. Pine, and Robert Francis Littlejohn.   See Exhibit D, attached hereto.

Subsequently, Mr. Pine resigned and was replaced by Kevin B. Naughten.  See Exhibit E, attached hereto.

16.     This Court has jurisdiction over the subject matter of this action pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et. seq., 28 U.S.C. § 1331 (federal question) because claims in the arbitration arise under the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78aa), and 28 U.S.C. § 1367 (pendent, supplementary and ancillary jurisdiction over the state law claims).

17.     Venue is proper in this Court under 28 U.S.C. § 1391 since a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of property that is the subject of the action is situated in this judicial district.  Venue is also proper pursuant to 9 U.S.C . § 10(a) because the arbitration occurred within this district.

18.     All parties are properly joined in this action, and are subject to the jurisdiction of this Court.

## THE CLAIMS AND COUNTERCLAIMS

19.     Doscher initiated the underlying arbitration and sought: (1) the recovery damages for his compensation as a Seaport employee and for wrongful termination; (2) the recovery of damages related to the Equity Interest; (3) a legal and equitable accounting regarding the Equity Interest; (4) a declaratory judgment that he still enjoys the Equity Interest; (5) alternatively, damages for the termination of the Equity Interest; and (6) damages for violations of FINRA's Rules of Conduct.  Doscher sought any award be entered against all of the Respondents under an alter ego theory, and sought a constructive trust be imposed over the assets of Seaport.  (Merolla Dec., Exhibit 5).

20.     In response, Respondents asserted a counterclaim against Doscher in which they admitted to the conferring the Equity Interest, and created an internal capital account for him, but that "because Mr. Doscher chose not to become a member of Seaport he was not entitled to any monies in that account." (Merolla Dec., Exhibit 6). The counterclaim sought the reimbursement of $821,707.26 from Doscher for his personal expenses paid for directly by Seaport from 2009 through 2012.

21.     Doscher denied any liability to Respondents for the $821,707.26 in personal expenses, contending that those amounts were routinely offset against positive balances contained in his equity account from 2010-2012.  (Merolla Dec. Exhibit 4).

### THE "EQUITY" DISPUTE

22.     The dispute between the parties regarding the Equity Interest is quite simple:

**Doscher's position**:  After being extremely successful since he began working at Seaport in June 2009, and to retain him within the Seaport organization, during 2010 he was given an equal equity interest in the residual Seaport profits (initially four other individuals, and then three – Respondents Meagher, Smith, and Meyer).

**Respondents' position**: Doscher was given the Equity Interest in 2010 and Seaport did create a capital account for him that consisted of an equal interest in the residual Seaport profits.  However, Respondents contend they would only "keep track" of Doscher's capital account starting in 2010, and he would "get it" **IF** he executed a written operating agreement.  According to Respondents, because Doscher "chose to not become a member of Seaport, he is not entitled to any monies in that account."  (Merolla Dec., Exhibit 6, p. 10).   However, this manufactured defense was eviscerated by Seaport's tax-

matters partner, Co-Founder Michael Meagher, whom admitted on cross-examination that he <u>never</u> told Doscher that the Equity Interest would disappear if he ever separated from the firm.  (Merolla Dec., Exhibit 30, p. 895).

23.    Indeed, the trial record completely lacks any evidence, testimonial or documentary, to support the contention that Doscher was ever told or informed that his Equity Interest was "hypothetical" and would only become "real" **IF** he executed a written operating agreement. Rather, the trial record evidenced a 3-year course of conduct in which Doscher:

- Was always considered a "partner" by Respondents Meagher, Smith, and Meyer until his termination in January 2013;

- Was held out as an owner of Seaport to employees and clients;

- Made decisions about the maintenance and expansion of Seaport's business as an owner; and

- Was allowed to spend $821,707.26 in personal expenses paid for directly by Seaport, and offset that amount against positive balances contained in the capital account created for him in 2010 without a single request to reimburse those amounts.  That is, until Seaport asserted such a demand in its counterclaim – 9 months after manufacturing the "acceptance" of Doscher's threatened resignation, which was never tendered.

   o As one example, in July 2012 Seaport directly wired $252,577.50 for Doscher's benefit from its business account, with the understanding that amount was being deducted from Doscher's capital account balance.  (Merolla Dec., Exhibits 193, 265 and

267).  No one ever asked Doscher to pay back that amount prior to his "resignation," and Seaport's explanation for allowing the wire for such a large amount was that "people tend to be helpful at Seaport."  (Merolla Dec., Exhibit 33, p. 1669).

24.    The 3-year course of conduct was for the "owners" to refer to each other as "partners" (like it states in Seaport's tax returns), which Doscher was in fact one of, and the person most responsible for Seaport's revenues (per its audited reports to the SEC) to grow from $29,831,053 in 2008 to $85,643,417 in 2012.  (Merolla Dec., Exhibits 46-53).  In addition, the evidence adduced at trial showed that Seaport treated Doscher as having the Equity Interest in its internal accounting records by tying his capital account balance to the net income of various Seaport entities throughout 2010, 2011 and 2012. (Merolla Dec., Exhibit 34, p. 1891).  Also shown at trial, Seaport created a "Guaranteed Payment Payable" Item in its Quickbooks Enterprise bookkeeping program for Doscher in 2010 (*Id.*, p. 1899-1900), the significance of which is that only "members" or "owners" of a limited liability company get paid through "Guaranteed Payments" – non-owners get compensated with W-2 wages.  (Merolla Dec., Exhibit 34, p. 1897).  Notably, one of the quirks to the Quickbooks computer program is that once an "Item" such as "Guaranteed Payments" is created, it can <u>never</u> be deleted.  (Merolla Dec., Exhibit 280). However, the individual entries can be entered and deleted without any tracking of the history.  (Merolla Dec., Exhibit 34, p. 1921-1922)

25.    Why is this important?  Regarding the Equity Interest, it goes to three issues.  First, it goes to whether Doscher's Equity Interest was "real" or just "pro forma," as argued by the Respondents.  Second, it goes to Doscher's claim on his distributive

share of the Seaport profits for 2010, 2011, and 2012.  Third, if extinguished, it goes to the value of Doscher's Equity Interest at termination.[1]

## RESPONDENTS' DISCOVERY ABUSE AND MISREPRESNETATIONS TO THE ARBITRAL PANEL

26.     During discovery prior to trial, Doscher sought the following critical information and process concerning the Equity Interest:

(a) Seaport's tax returns for 2009 through 2012, including an Order directing Seaport to execute IRS Form 4506 to allow Doscher to retrieve the actual filed tax returns from the IRS;

(b) the native internal accounting records on Seaport's Quickbooks program;

(c) pre-trial depositions to assist streamline the issues for trial; and

(d) non-party subpoenas on Seaport's accountants, Povol and Feldman, to receive the state and federal tax returns of the Respondents as well the documentation it delivered to Doscher's forensic accountants, Sobel & Co.  (Merolla Dec., Exhibits 17 and 22).

27.     It took <u>seven months</u> for Respondents to produce a single document after Doscher's initial document requests, and then they initially only produced K-1's for the members of Seaport from 2009 through 2012.  This forced Doscher to file a motion to compel on April 24, 2014, since the tendered documents were significantly inconsistent. For example, the capital account balances contained in the K-1's did **NOT** match the capital account balances delivered in spreadsheets prepared by the Respondents' accountants Povol and Feldman.  (Merolla Dec., Exhibit 17, p. 2).  Respondents produced documents listing Doscher as having cumulative capital account balances of:

---

[1] Doscher's valuation expert, Carl Jenkins of Duff & Phelps, testified that the value of Seaport as of the date of his termination was $128,500,000.00.

**$1,422,200.18 as of November 30, 2010**
**$500,638.90 as of December 31, 2010**
**$682,178.83 as of December 31, 2011**
**$821,226.88 as of December 31, 2012**

(Merolla Dec., Exhibit 20, p. 2). Meanwhile, the Capital Account Allocations for

Respondents Meagher and Smith on this spreadsheet showed the following balances:

|  | Respondent Meagher | Respondent Smith |
|---|---|---|
| December 31, 2010 | $7,466,596.62 | $5,391,968.17 |
| December 31, 2011 | $6,801,316.63 | $5,208,046.57 |
| December 31, 2012 | $5,046,172.07 | $3,171,756.17 |

However, the purported K-1's delivered to the Internal Revenue Service for Respondents

Meagher and Smith for these years attested to the following balances:

|  | Respondent Meagher | Respondent Smith |
|---|---|---|
| December 31, 2010 | $8,352,704.00 | $6,294,079.00 |
| December 31, 2011 | $9,385,719.00 | $7,808,452.00 |
| December 31, 2012 | $6,398,658.00 | $4,540.242.00 |

Even more curious on the K-1's produced, was the inconsistency with the opening and

ending capital account balances. For example:

|  | Respondent Meagher | Respondent Smith |
|---|---|---|
| Beginning balance (1/1/10) | $6,122,811.00 | $5,779,476.00 |
|  |  |  |
| Ending balance (12/31/10) | $8,352,704.00 | $6,294,079.00 |
| Beginning balance (1/1/11) | $7,993,055.00 | $5,934,433.00 |
|  |  |  |
| Ending balance (12/31/11) | $9,385,719.00 | $7,808,452.00 |
| Beginning balance (1/1/12) | $9,914,895.00 | $8,337,622.00 |
|  |  |  |
| Ending balance (12/31/12) | $6,398,658.00 | $4,540.242.00 |

In addition to the $300K - $600K gaps from December 31 to January 1, the 2011 K-1's

indicated they were <u>amended</u> returns. (*Id.*, p. 11-12).

28.     Also contained in the April 24, 2014 motion to compel, Doscher sought an

Order compelling Respondents to produce all documentation and information they made

available to Doscher's forensic accountants, Sobel & Co. from May 2012 through September 2012, when he was still an employee at Seaport, months before the dispute arose that resulted in his termination in January 2013.  (*Id.*, p. 14-15).  At this time, and because of the refused to deliver a copy of its file, Doscher was suing Sobel & Co. and a law firm he hired to investigate Seaport's financials before possibly executing a proposed operating agreement in *Doscher v. Sobel & Co., LLC, et.*al, USDC SDNY Case No. 14 CV 646, which remains pending.  It is uncontested that Sobel & Co. received documentation and information from Seaport on three occasions:

- certain financial documents delivered via Federal Express with a cover letter dated May 7, 2012 from Ronald G. Blum;

- A "thumb drive containing electronic documents that [Sobel & Co.] previously requested" from Povol & Feldman on June 13, 2012; and

- In connection with an on-site examination of Seaport's Baywatch computer systems, around September 14, 2012, Sobel & Co. received a number of categories of documentation.

Prior to filing the motion to compel, Doscher asked Respondents to reconsider its position and simply produce the documentation and information delivered to Sobel & Co., but counsel were only willing to produce the documents they delivered on May 7, 2012, but not the rest.  (*Id.*, p. 15).  It took an Order to compel production.  (Merolla Dec., Exhibit 21).

29.    In the April 24, 2014 motion to compel, Doscher also sought the production of the current Operating Agreement of Seaport, believed to have been executed by Respondents Meagher, Smith, and Meyer about 6 months after Doscher's

termination, in May 2013, as well as the merger documents involving Global Hunter that was announced in a press release in September 2013. (*Id.*, p. 17).

30.    Noting this was an Industry Dispute, Doscher explained that the parties were obligated to "cooperate to the fullest extent practicable in the exchange of documents and information **to expedite the arbitration.**" Rule 13505 of the Code. Doscher suggested that this was not a case of "we didn't do it;" rather, Respondents were playing a game of "you can't prove it." And since Respondents were <u>solely</u> in possession of the information related to the Equity Interest, an order compelling the production of certain documents, and implementation of other discovery devices was necessary to have a full and fair final hearing. (Merolla Dec., Exhibit 17, p. 3). In addition, given the lack of production, Doscher requested an adjournment of the then-scheduled final hearing dates in June 2014. (*Id.*)

31.    In opposition, in addition to opposing the request for an adjournment because "there is no reason to change the hearing," regarding the request for the production of Seaport's native QuickBooks accounting files, Respondents asserted:

> **Claimant's unsupported argument that this information "can be easily produced by burning a copy of the QuickBooks files on a disk" (Mot. 13) is wrong – this information, as one would expect, is voluminous and most of it in no way concerns this case.** (Merolla Dec., Exhibit 19, p. 3).

This statement was ultimately proven to be false by not one, but two Seaport witnesses. First, Seaport's CFO/Chief Compliance Officer Marcus Witthaut testified on <u>the second to last day of evidence</u> that he would send QuickBooks files to Seaport's accountants Povol & Feldman "in backups" on a regular basis, which Povol and Feldman could then "load into QuickBooks on their side." (Merolla Dec., Ex. 33, p. 1698, 1702). Second, Allen Povol of Povol & Feldman testified on <u>the last day of evidence</u> that "there's a way

to cut the years" when delivering an electronic version of QuickBooks.  (Merolla Dec.,
Exhibit 34, p. 1923).

     32.    Regarding the demand for tax returns, Respondents argued:

> **tax returns are not generally discoverable, unless a party makes "a strong
> showing of overriding necessity" that the tax returns are both indispensable
> and include information that is unavailing from other sources.** *Matthews
> Indus. Piping Co., Inc. v. Mobil Oil Corp., Corp.,* **114 A.D.2d 772, 772 (1st
> Dept. 1985);** *see also S.E.C. v. Cymaticolor Corp.,* **106 F.R.D. 545, 547
> (S.D.N.Y. 1985) (before ordering production of tax returns, "first, the court
> must find that the returns are relevant to the subject matter of the action;
> and second, that there is a compelling need for the returns because the
> information contained therein is not otherwise readily obtainable").**

(Merolla Dec., Exhibit 19, p. 4).

Respondents then suggested:

> **if Claimant has questions about the numbers included in his submission, he
> may inquire at the hearing – having questions is not grounds for demanding
> highly intrusive irrelevant discovery.**

(*Id.*)

Counsel was correct on the law.  And by in fact ordering the production of tax returns,
the Arbitral Panel necessarily found that their production was: (1) relevant to the subject
matter of the action; and (2) there was a compelling need for the returns because the
information contained therein was not otherwise readily available.  It turns out, once the
case went to trial, not only were there multiple tax returns for the same year, but not a
single Respondent witness could identify which tax returns and K-1s were actually filed
with the IRS.  For example, when Seaport's tax-matters partner, Cornell Law graduate
Michael Meagher was confronted with two (2) separate K-1s for 2009 that were produced
during discovery and contained significantly different financial information, he testified:

> **A:    I'm really confused.  Why would there be two K-1s for 2009.  We
> would have filed one K-1 for 2009 that would be a part of our tax return.  I
> don't know why there would be two.**

**Q.     I don't know why either.  I don't know why one would be different after a motion to compel.**

(Merolla Dec., Exhibit 30, p. 886).

33.     Regarding the demand for documents Seaport provided to Sobel & Co., Respondents argued in opposition that there was no dispute between the parties:

> **As to discovery here, Respondents have agreed to produce documents that were provided to Sobel & Co. on May 7, 2012. Claimant, however, still requests more - documents provided to Sobel & Co. in June 2012 (by Seaport's accountant, Povol & Feldman) and September 2012 (by Seaport). We understand that Povol & Feldman did not make copies of any materials that they provided to Sobel & Co. We are revisiting the topic of any documents that Seaport directly provided to Sobel & Co. and intend to provide any such documents that are located to Claimant.**

(Merolla Dec., Exhibit 19, p. 7).

34.     For pre-trial depositions and a non-party subpoena on Povol & Feldman request, Respondents said that "all of the questions counsel describes as topics for deposition can be explored at the hearing," and "Respondents have produced responsive documents from Povol & Feldman, Seaport's accountants."  (*Id.*, p. 9)

35.     The request for depositions and non-party subpoenas were denied, as was the request for an Order directing Seaport to execute IRS Form 4506 to allow Doscher to retrieve the actual filed tax returns from the IRS.  The motion to compel the production of the current Operating Agreement of Seaport and the merger documentation with Global Hunter was denied, but Seaport was ordered to produce the following documentation:

- K-1s for all members of Seaport during the years 2009 to 2013.

- "Those eight categories of documents previously provided the The Seaport Group, LLC to **Sobel & Co., LLC** for the years ended 2009-2011 in connection with its due diligence performed on behalf of Claimant (as more particularly described on pages 14-15 of Claimant's Motion to Compel Discovery dated April 24, 2014 ("Claimant's Motion").  Such categories of documents shall be produced for the years ended 2012 and 2013 in **native format, unredacted with metadata intact**."

- All documentation provided to **Sobel & Co., LLC in June 2012** and September 2012 (as more particularly described on page 15 of Claimant's Motion).

(Merolla Dec., Exhibit 21).

Subsequently, <u>on the last day of evidence at trial</u>, Seaport's certified public accountant Allen Povol revealed and confirmed what Doscher suspected all along regarding what he gave Sobel & Co. in June 2012:

> **THEY TOOK THE QUICKBOOKS FILES. WE GAVE THEM A COPY OF THE QUICKBOOKS FILES SO THEY DID WHATEVER THEY DID WITH IT.  I DON'T KNOW.**  (Merolla Dec., Exhibit 34, p. 1949).

Seaport and their counsel <u>never</u> produced any Quickbooks files to Doscher before, during, or after the trial.

36.     In response to the Order compelling production, on May 13, 2014, Respondents produced tax returns for 2009 and 2010 under a cover letter from Ronald G. Blum, Esq. dated May 7, 2012.  (Merolla Dec., 22, p. 2).  Four months later, <u>on the last day of evidence at trial</u>, counsel Ronald G. Blum and Prana Topper both admitted that tax returns were delivered in discovery that were <u>not</u> filed with the IRS:

> **MS. TOPPER:** Todd, help me out here. I'm trying to be cooperative and get you documents.  <u>We spent lunch to get to Mr. Povol's office to get the documents.</u> Tell me what document you would like so that we can give it to you.
> **MR. MEROLLA:** <u>I would like what you contend was actually filed with the IRS.</u>
> **MS. TOPPER:** <u>I don't contend anything.  **It was filed or it wasn't filed**</u>. So you would like the K-1 that was filed with the IRS for 2010; am I understanding correctly?
> **MR. MEROLLA:** Correct.  <u>I would also like copies of everything that was actually filed with the IRS that's subject to our discovery request.</u>
> **MR. BLUM:** ~~Then you need to go into the document production~~, because in your binder are documents that were produced that were filed that are not in the binder.
> **MR. MEROLLA:** There are also documents that were produced that were not filed with the IRS.
> **MR. BLUM:** That's correct.
> **MR. MEROLLA:** <u>All I asked for in my requests were the filed tax returns.</u>

**MR. BLUM: <u>And what we gave Sobel</u>**.

**MR. MEROLLA:** We don't have the production of everything that was filed. Do we?

**MR. BLUM:** It sounds like you're missing the 2011 amended return where one K-1 was added.  I agree with that.  If we had been asked this question in June, in May, June, July or August we could have worked it out.

**MR. MEROLLA:** The disingenuousness is palpable at this point.  It took two motions to compel, you ordered them to do it.  I filed a motion for contempt to get another production.

      Here we are at trial and Mr. Blum is suggesting that when they were kicking and screaming to get that first adjournment when all we asked for was to have them comply with production, give us 60 days and let's get this thing going.

(Merolla Dec., Exhibit 34, p. 1942-1943).

37.     Turning back to May 2014, Respondents supplemental production with respect to the internal accounting reports consisted of <u>not</u> QuickBooks files "in native format, unredacted with metadata intact," but rather Excel spreadsheets that were <u>exported</u> from Seaport's Quickbooks files in direct violation of the discovery Order. Prior to filing a motion for sanctions, the undersigned spoke with Prana Topper about the lack of compliance and was told:

(1) <u>Respondents did not know what was provided to Sobel in June 2012</u>;

(2) <u>Counsel for Respondents did not know what was provided to Sobel in June 2012</u>; and

(3) "<u>after a lengthy conversation with Seaport's accountant Povol & Feldman</u>," counsel was informed by Povol & Feldman that while a thumb drive of documentation and information was in fact given to Sobel in June 2012, <u>Povol & Feldman do not know what in fact was given to Sobel at that time</u>.  (Merolla Dec., Exhibit 22, p. 3)

At trial four months later, Povol testified that he gave Seaport's QuickBooks file to Sobel & Co. in June 2012.  (Merolla Dec., Exhibit 34, p. 1949).

38.     In support of the motion for sanctions and a continuance from the June

2014 final hearing dates, Doscher argued that Respondents were clearly "gaming the

process:"

> It is a *fait accompli* that Mr. Doscher will receive this information **eventually**,
> **in either this forum or another, but it is now beyond clear that Respondents**
> **and their counsel have engaged in manipulative conduct to prevent this from**
> **occurring, with the direct hope and plan that a trial may occur in this case**
> **before Mr. Doscher has a fair opportunity to receive and thereafter analyze**
> **and prepare his case against them for millions of dollars of compensation**
> **that was converted to their benefit.**
>
> They must not be rewarded for these tactics, as it is in the interests of justice
> **to ensure complete production in fact takes place and Mr. Doscher be given**
> **adequate time to analyze and prepare his case.  As such, the June 2014**
> **hearing dates must be continued indefinitely, until Respondents are fully**
> **compliant with the Orders of the Arbitral Panel.**

(Merolla Dec., Exhibit 22, p. 3).

As part to the motion, in addition to compliance with the prior document production

Order and sanctions be imposed pursuant to FINRA Rule 13511 and 13212, Doscher

once again requested an Order directing the execution of IRS Form 4506 for the federal

tax returns of Seaport for the years ended 2009, 2010, 2011, and 2012.  (*Id.*, p. 5-7).

39.     In opposition, by letter dated May 21, 2014, Respondents insisted that the

trial "should commence on June 9 to address all of the liability and damages issues,"

while at the same time acknowledging that they expected to be ordered to produce more

documents.  (Merolla Dec., Exhibit 23, p. 1-4).  Regarding the lack of production of the

Quickbooks files given to Sobel & Co., Ronald G. Blum represented:

> **We said that neither Respondents nor their accountants, Povol & Feldman,**
> **had a copy of or knew what documents were on the "thumb drive" provided**
> **to Sobel in June 2012.** (*Id.*, p. 1-2)

Mr. Blum continued the misrepresentations in his letter, stating that with respect to the

order to produce documents provided to Sobel in June 2012 and September 2012, that

**Respondents have complied in full, and also produced, as we represented we would, documentation provided to Sobel on May 7, 2012:**

> **• The materials produced that were provided to Sobel in May 2012 include approximately 250 pages of internal financial schedules for 2009, 2010 and 2011, year-end financial statements, <u>and tax returns for 2009 and 2010</u>. Respondents included those documents since we represented that the May 2012 materials would be produced, despite the Panel's Order that tax returns (other than K-ls) need not be produced (Ex. A at 1).**

> **• Claimant requested a "thumb drive" provided to Sobel on June 13, 2012 (April 24 Ltr. At 15) and Respondents (and their accountants) are not withholding it. <u>We do not have it or a list of what was on it</u>. The only entity that may have the thumb drive is Claimant's own accountants, Sobel. Claimant has a fee dispute with Sobel and now filed a securities fraud lawsuit against Sobel. This arbitration should not be put off because of <u>Claimant's fee dispute</u> or fraud lawsuit. <u>These are not Respondents' issues</u> and Claimant should not use them to try to obfuscate this case, particularly when Claimant never asked this Panel for a subpoena to Sobel.**

(Merolla Dec., Exhibit 23, p. 2).

A few problems with these statements. First and foremost, it came out at trial that

Seaport's Michael Meagher was involved in the decision by Meyer and counsel William

Foster to not consent to Doscher receiving his file from Sobel & Co. (Merolla Dec.,

Exhibit 40, p. 1528-1529). That is, while Ronald G. Blum was arguing to the Arbitral

Panel that Doscher has only himself to blame for not getting Sobel & Co.'s file, which

Seaport was ordered to produce whatever was given to Sobel & Co., *the* **reason** for Sobel

& Co. not turning over its file to Doscher **was because of Seaport's direction**. Second,

the representation was that Respondents produced "tax returns for 2009 and 2010. Yet

during trial, Ms. Topper refused to "contend" what was filed and what wasn't filed, and

Mr. Blum admitted that the tax returns he gave to Sobel & Co. were in fact <u>not</u> filed with

the IRS. (Merolla Dec., Ex. 34, p. 1942-1943). Third, Mr. Blum falsely represented that

Respondents did not know what was on the thumb drive because on the last day of trial,

Seaport's Povol testified that he gave Seaport's QuickBooks file to Sobel & Co. in June 2012. (Merolla Dec., Exhibit 34, p. 1949). Fourth, there was no "fee dispute" with Sobel as of the date of her letter, May 21, 2014, because Seaport in fact paid off Sobel's balance for the work it did for Doscher and presumably directed Sobel to not deliver any documentation to him – it was Seaport's "confidential" information that Sobel was concerned with disclosing. (Merolla Dec., Exhibit 279). Mr. Blum's representation that Respondents in fact produced the documents that were provided to Sobel in compliance with the discovery order (Merolla Dec., Exhibit 23, p. 3) turns out to be false, and known by him to be false in an effort to deceive the tribunal.

40.     By Order dated May 30, 2014, the Arbitral Panel granted the continuance, denied any sanctions, denied the request for a third-party subpoena on Povol & Feldman and the execution of IRS Form 4506, but did Order the Respondents to produce some additional documents. (Merolla Dec., Ex. 25). Incredibly, the Order reversed the prior ruling that the accounting records produced need not be produced in "Quickbooks native file." (*Id.*).

## THE EVIDENCE AT TRIAL

41.     The factual allegations contained in Doscher's Amended Statement of Claim (Merolla Dec., Exhibit 5) were consistent with the trial evidence. First employed by Seaport in June 2009, Doscher and Respondent Meyer were primarily responsible for growing Seaport from roughly 40 employees in June 2009 to 220 employees in January 2013, when Doscher was terminated in January 2013. (Merolla Dec., Exhibits 5 and 27, p. 40-58).

### Doscher's Compensation

42.     Initially, Doscher was compensated by Seaport on a pure commission basis that included any salary draws delivered by Seaport on a bi-monthly basis, plus customary employment benefits.  (Merolla Dec., Exhibits 5 and 27, p. 69-82).  Seaport allocated 65% of revenue to each department ("Department Revenue"), and retained 35% for general and administrative expenses and owner equity ("GAOE").  *Id.*  Meagher and Smith exclusively managed and controlled the GAOE.  (*Id.*)  For Doscher, Seaport revenue earmarked for Department Revenue was allocated as follows: (i) as Trader, Doscher received 10% of gross Seaport commissions made on trades he facilitated;[2] (ii) as Salesperson, Doscher had discretion to allocate sales commissions with other Seaport employees involved in a particular trade, involving his clients, with Doscher receiving 50% of his portion of the sales commission due and the other employee(s) receiving 40% of the sales commission due; (iii) as Head of the Distressed Bond Trading Department, Doscher received 5% of all gross Seaport commissions within the Distressed Bond Trading Department; (iv) as Co-Head of the High Yield Bond Trading Department, Doscher received 2.5%  of all gross Seaport commissions within the High Yield Bond Trading Department (Meyer received the other 2.5% as co-Head); (v) if the commissions disbursed for (i) through (iii) were less than 65% of the Seaport revenue for a particular trade, Doscher would receive the difference as a Management Override; and (vi) similarly, for the High Yield Bond Trading Department, if the commissions disbursed were less than 65% of the Seaport revenue for a particular trade, Doscher and Meyer

---

[2] This being so despite the fact that his June 2009 employment letter stated he would receive 25% as a trader.  (Merolla Dec., Ex. 54).

would evenly split the difference as a Management Override (collectively, the "Doscher Compensation Agreement"). (*Id.*)

## Seaport Grants Doscher the Equity Interest

43.     As stated by Meagher at trial, Doscher was the number one producer for Seaport in 2009, 2010, 2011, and 2012 and the "leader of the company." (Merolla Dec., Exhibit 30, p. 825). In fact, Doscher's own production numbers exceeded the combined production of the other three partners (Smith, Meagher, and Meyer). Realizing the earning power of Doscher, and to some extent Meyer, Smith and Meagher began to discuss them becoming "partners" in Seaport. (Merolla Dec., Exhibit 27, p. 86-92). In 2010 Doscher and Meyer agreed, and it was determined that Doscher and Meyer would become "Co-Heads of All Sales and Trading" for Seaport. (*Id.*) In furtherance of their becoming "partners" in Seaport, as held out to Seaport's employees and clients, and noted on Doscher's business card (Merolla Dec., Exhibit 36), Doscher and Meyer were given American Express "Black" cards, and a "phantom" equity account in Seaport was created for each of them. (Merolla Dec., Exhibit 27, p. 86-92). Initially, Doscher was told by Seaport's CFO and Chief Compliance Officer Marcus Witthaut that his personal expenses on the Black Card would be taken out of his commissions, but then later said that it would be deducted from his capital account balance. (*Id.*, p. 88-90). At no point prior to his termination did Seaport deduct Doscher's personal expenses from his commissions or so much as ask Doscher to reimburse the company for $821,707.26 in personal expenses from 2009 through 2012. (Merolla Dec., Exhibit 33, p. 1696). Doscher was also never asked to execute any operating agreement as a pre-condition to receiving the Equity Interest, which was initially 20%, when the partners of Seaport

consisted of Meagher, Smith, Doscher, Meyer, and Mark Miller. (Merolla Dec., Exhibit 27, p. 91-92). When Miller resigned in 2012, Doscher's Equity Interest was an equal 25%, along with Meagher, Smith, and Meyer. (*Id.*, p. 92-93). Doscher understood the Equity Interest as being the residual interest in the profits of all of Seaport's operations. (*Id.*, p. 94).

### Sobel & Co. Audits Seaport

44.     In April 2012, when Meagher and Smith began pressuring Doscher to execute a Seaport operating agreement, Doscher retained Sobel & Co. and the law firm McMillan, Constabile, Maker & Perone, L.P. to assist him review certain reporting and compliance aspects of the Seaport entities. (Merolla Dec., Exhibit 29, p. 512-517, Exhibit 208). Over the following 7 months, Sobel received a multitude of documents from Seaport and its accountants Povol & Feldman, which included "full access" to Seaport's electronic version of Quickbooks, and resulted in a Memo issued to Docher's attorneys dated December 6, 2012. (Merolla Dec., Exhibit 209). The Memo noted that "the accuracy of the allocation of income cannot be easily determined and more transparency should be afforded to the potential members." (*Id.*)

### The Greektown Dispute

45.     Around this time, December 2012, a significant dispute arose between Doscher on the one hand, and Meagher, Smith, and Meyer on the other hand, regarding certain activities by Smith that Doscher believed violated the applicable FINRA Front Running Policy at the time, NASD IM-2110-3. The timeline of events were identified in Doscher's Amended Statement of Claim and were amplified by the trial evidence. (Merolla Dec., Exhibits 5, 27, p. 132-267, 29, p. 551-591). As Seaport's Co-Head of

Sales and Trading, the Greektown events caused Doscher to have concern for his Series 24 license, which he believed was compromised after Respondent Smith lied to him on two occasions that Seaport's Investment Bankers would no longer engage in Greektown equity (which the trading desk had standing orders from long-time clients). (*Id.*). Doscher was accused of being a liar by two clients, and demanded Seaport terminate the employment of the banker engaging in activities that violated agreed-upon protocol, or else he would resign. (*Id.*) Seaport "accepted" his resignation before it was tendered, immediately turned off his e-mail, coordinated a press release with Bloomberg News, and Doscher was not even allowed to collect his belongings at the office. (Merolla Dec., Exhibits 27, p. 131-132, 264, 29, p. 347-357).

46. At trial, Securities Law and Compliance expert George Brunelle testified that Doscher's concerns regarding Greektown were absolutely justified, and that Seaport's actions constituted a violation of the Best Execution Rule and a conflict of interest that should have been self-reported to FINRA. (Merolla Dec., Exhibit 33, p. 1737-1789).

## THE LEGAL ISSUES APPLICABLE TO EQUITY INTEREST

47. As stated earlier, the parties agree that Doscher was given the Equity Interest in 2010 (as was Meyer), but the Respondents contend they were only going to "keep track" of Doscher's capital account starting in 2010, and he would "get it" **IF** he executed a written operating agreement. Seaport's tax-matters partner and Cornell Law graduate Michael Meagher testified at trial, on direct examination, that at the end of 2010, he, Smith, and Mark Miller decided to give Doscher (and Meyer) equal ownership in Seaport:

A.      ....So the three of us decided together you know what, let's do it. We went back to them and said fine, we will give you equal ownership in the company with the rest of us, so we would all have a 20 percent interest.

Q.      In connection with that, what happened next with respect to –

A.      Well, they wanted their share of what the profits were for 2010, so we agreed to do that.  This is happening at the end of 2010, the beginning of 2011.  We didn't have a deal about that but we agreed to it.

So we said we'll keep track of the number that you would be entitled to when you sign the  document and become members of the company, because we weren't going to give them the money unless we were getting them tied down to the company.

So we kept track of what the members would be when they become **partners**.  So that was just a number on a piece of paper, no rights associated with it, it was just a number.  When they signed we were going to give them that money.

Q.      When you say that was just a number on a piece of paper, who had paid taxes on that amount of money?

A.      **The three _partners_ who were the members of the Sea Port LLC paid taxes on that money in 2010.**

(Merolla Dec., Exhibit 30, p. 791-792).

48.     In so testifying, Mr. Meagher impeached his own attorney's opening statement that "member" and "owner" are used interchangeably and identically (Merolla Dec., Exhibit 27, p. 22), when in fact he and his co-owners consistently referred to their ownership interests as that of "partners" or of a "partnership."  Those examples will be shown below.  And put aside the fact that while Meagher testified that Doscher and Meyer wanted their share of whatever "the profits were for 2010" (Merolla Dec., Exhibit 30, p. 791-192), the purported tax returns delivered during discovery and entered into evidence for Seaport for 2010 showed an ordinary business income **loss** of $5,971,254 or $7,252,659, depending on which one, if any, you want to believe was actually filed with the IRS.  (Merolla Dec., Exhibits 175 and 177).  Meagher initially testified that the members of Seaport paid taxes on the 2010 profits, but once confronted with these tax returns, reversed himself and said that he could not tell "from an accounting standpoint whether we were profitable in 2010."  (Merolla Dec., Exhibit 31, p. 1011-1012).

According to the 2010 K-1's delivered by Respondents, Meagher received an ordinary business <u>loss</u> from Seaport in the amount of ($3,644,333) while receiving guaranteed payments of $2,823,876 and ordinary dividends of $2,513,788.  (Merolla Dec., Exhibit 170).  Similarly, Smith received an ordinary business <u>loss</u> in the amount of ($3,644,331) while receiving guaranteed payments of $2,636,484 and ordinary dividends of $2,602,296.  Exactly what were the profits (losses) of Seaport in 2010 remains unknown.

49.     The 3-year course of conduct presented at trial did <u>not</u> evidence Doscher was ever informed that the Equity Interest became "real" only upon the signing of an operating agreement.  Rather, he was held out as a Seaport "partner," (Merolla Dec., Exhibit 187), he was considered a "partner" by Meagher and Smith (Merolla Dec., Exhibit 183), he was given statements at the end of every year informing him what the balance was in his capital account (Merolla Dec., Exhibit 28, p. 279), and he was permitted to offset $821,707.26 in personal expenses over 4 calendar years against that capital account that included a $252,525.00 wire in July 2012 (Merolla Dec., Exhibit 193).  And perhaps most importantly, he was <u>never</u> given a legitimate draft operating agreement to execute, even if one were to believe that the Equity Interest was conferred on him with that condition.  In fact, <u>three days before</u> he was unceremoniously terminated and cut-off as an employee of Seaport, on January 8, 2013, Meagher, Smith, and Meyer all "agreed" at an off-site meeting, while Doscher was sick with the flu, that Meagher would submit to Doscher (and Meyer) within the following two weeks a "streamlined partnership document" detailing: (a) Streamlined Capital Accounts; (b) Similar Non-Compete; and (c) Exit Options.  (Merolla Dec., Exhibit 147).  Rather than submitting a "streamlined partnership document," Seaport terminated Doscher <u>three days later</u> on

January 11, 2013.  (Merolla Dec., Exhibit 149).  Yet according to Respondents, because Doscher "chose to not become a member of Seaport, he is not entitled to any monies in that account."  (Merolla Dec., Exhibit 6, p. 10).   However, this manufactured defense was self-eviscerated (again) by Seaport's tax-matters partner, Co-Founder Michael Meagher, whom admitted on cross-examination that he <u>never</u> told Doscher that his Equity Interest and capital account would disappear if he ever separated from the firm. (Merolla Dec., Exhibit 30, p. 895).

50.     To put into context the significance of the complete impeachment of Mr. Meagher on cross-examination, as well as that of Mssrs. Smith, Meyer, Witthaut, and Povol, two contract law principles applicable to Doscher's "Equity" claim must be bore in mind: (1) Course of Conduct; and (2) Frustration of Performance.

## Course of Conduct

51.     Under Delaware law, where the Seaport entities are incorporated, "a written agreement between contracting parties, despite its terms, is not necessarily only to be amended by formal written agreement."  *Pepsi-Cola Bottling Co. v. Pepsico, Inc.,* 297 A.2d 28 (Del. 1972).  "The reason for this is that the parties have a right to renounce or amend the agreement in anyway they see fit and by any mode of expression they see fit. They may, by their conduct, substitute a new oral contract without a formal abrogation of the written agreement.  *Id.* [Court affirmed an oral modification of a written agreement based on the parties course of conduct, notwithstanding a provision in the written agreement prohibiting any changes without an executed bilateral agreement].

52.     Under New York law, "in determining whether the parties entered into a contractual agreement and what were its terms, it is necessary to look, rather, to the

objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *Brown Bros. Electrical Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397 (1977). A modification of a written agreement may be "implied in fact from the conduct of the parties." *Webster's Red Seal Publications, Inc. v. Gilberton World-Wide Publications, Inc.*, 67 A.D.2d 339, 342 (1st Dept. 1979); *aff'd* 53 N.Y.2d 643 (1981). Furthermore, the inclusion of a clause requiring written modifications may be waived if there is a change in course of conduct. *Tridee Assocs. v. N.Y. City Sch. Constr. Auth.*, 292 A.D.2d 444 (2d Dept. 2002).

## Frustration of Performance

53.     In New York, "If a promisor himself is the cause of the failure of performance of a condition upon which his own liability depends, he cannot take advantage of the failure. It is a well-settled and salutary rule that a party cannot insist upon a condition precedent, when its non-performance has been caused by himself." *Amies v. Wesnofske*, 255 N.Y. 156, 162-163 (1931).   If the promisor is under a duty to do what it can to bring about the realization of the condition, the failure to do so, whether by active or passive steps, would seem to breach that duty and waive the condition. *Semi-Tech Litigation, LLC v. Bankers Trust Company*, 450 F.3d 121 (2d Cir. 2006), citing *RESTATEMENT (SECOND) OF CONTRACTS* § 225 *cmt. B* (1981).

54.     This concept is applicable in that Seaport frustrated Doscher's performance on the purported (and disputed) condition that his Equity Interest and capital account balance would become "real" only upon the signing of a written operating agreement. Respondents never delivered a "signable" operating agreement, and by January 2013, when they refused to legitimately investigate and/or self-report a serious

and material Compliance issue, Doscher was terminated.  *See M. O'Neil Supply Co. v. Petroleum Heat & Power Co.,* 280 N.Y. 50, 56 (1939) ["the defendant cannot rely on the condition precedent to prevent recovery where the non-performance of the condition was caused or consented to by itself"].

### EACH AND EVERY CONTENTION RAISED BY THE RESPONDENTS REGARDING DOSCHER'S EQUITY INTEREST WAS EVISCREATED ON CROSS-EXAMINATION (AND OFTEN ON DIRECT)

55.     Respondents manufactured a number of contentions in defense of Doscher's claim regarding the Equity Interest, and to which he was seeking an accounting as to what those profits were, damages for its termination and/or a declaratory judgment that he still retains that interest.  Doscher does not dispute that he never signed a Seaport operating agreement.  But that is just the beginning of the inquiry, as black letter law on Course of Conduct and Frustration of Performance principles apply to the facts and circumstances of this case.  Each one of Seaport's contentions is discussed below and shown to have been completely impeached.

**False Seaport Contention No. 1:**     **"Member" and "Owner" are used identically.**

56.     During opening statement, Seaport's attorney Ronald G. Blum proclaimed that "member" and "owner" are used interchangeably and identically.  (Merolla Dec., Exhibit 27, p. 22).  The evidence presented at trial, many times by Seaport's witnesses on <u>direct</u> examination, showed that Meagher and Smith in fact used the word "partner" to indicate ownership.  For example, in the first five minutes of direct examination, Meagher testified that "Mr. Miller who was at one time a <u>partner</u>, excuse me, a manager member of Sea Port Group…."  (Merolla Dec., Exhibit 30, p. 741).  A few minutes later, Meagher testified that "Seaport V is an investment <u>partnership</u> that Steve and I <u>own</u> that

was a subsidiary of The Seaport Group." When asked with whom Seaport V was a

partnership, Meagher responded: "Steve (Smith) and I are the partners." (*Id.*, p. 769-

770). In fact, Seaport V, one of the named Respondents herein, is a limited liability

company, just like The Seaport Group, LLC, and technically in the legal sense, Meagher

and Smith were the "members" only as of September 24, 2012. (*See*, Merolla Dec.,

Exhibits 31, p. 1001-1007). Prior to that, Seaport V, LLC was a wholly owned subsidiary

of The Seaport Group, LLC. (*Id.*) There were numerous other examples of conflating

the term "partner" with "owner."[3]

57.     On cross-examination, there was even more. For example, when asked

who his current partners were at the merged entity Seaport Global Holdings, LLC,

Meagher said there were "five main partners, but there are several people who own small

interests in the company that we merged with." (*Id.*, p. 855). Meagher repeated that he

and Smith were the partners of Seaport V, LLC. (*Id.*, p. 866). He also testified that

Doscher was not an owner of Seaport because "he was not a member of the LLC as I

---

[3] For example: Merolla Dec., Exhibit 30, p. 773 [Mark Miller wanted to be equal partners
in the limited partnership…he wanted to be an owner]; p. 774 [Seaport's Amended and
Restated Operating Agreement "evidences Mark Miller becoming an owner and partner
in The Seaport Group, LLC]; p. 789-790 [asked about when ownership was offered to
Doscher: "it was a dilemma for us because the three partners had invested all of the
capital in the company."]; p. 791-792 [Seaport kept rack of Doscher's capital account for
when he became a partner.]; p. 811 [Miller would relinquish his ownership interest and
exit as a partner in Seaport when Doscher and Meyer as admitted as partners.]; p. 813-
814 [Meagher became concerned in the Fall 2012 because he did not receive any
feedback on the partnership documents.]; p. 823 [regarding Greektown, Meagher was
convinced after speaking with Smith, the person he owned Seaport with, that he was not
about to fire someone because Doscher claimed his partner (Smith) was a liar.]; p. 826
[Meagher though Doscher "resigned" because he no longer wanted to become a partner
in Seaport.]; and p. 840-841 [Meagher agreed to "share the profitability of the company"
with Doscher and Meyer when they became members of the company, and said "we're
not giving you this unless you become partners."]

understood it.  He was not a <u>shareholder</u> in the company."[4]  (*Id.*, p. 897).  And when

discussing how Seaport V was treated as a separate asset in the Seaport operating

agreement, Meagher testified: "So because Seaport V was an asset of Mike and Steve's

that other <u>partners</u> didn't share in it made our financials at Seaport incredibly

complicated…" and regarding the decision to put <u>ownership</u> of Seaport V in the personal

name of he and Smith, "it was just going to be simpler in view of the fact that we were

going to have more <u>partners,</u> and we were going to offer <u>equity</u> interest to other

employees…"  (*Id.*, p. 910-912).

58.      "Member" and "owner" are used interchangeably and identically? Hardly.

"Owner" and "partner" used interchangeably and identically?  You bet.  Notably, the tax

returns refer to the "owners"/"members" as Partner 1, Partner 2, etc.  (See e.g., K-1s,

Merolla Dec., Exhibits 169-173).

### RONALD G. BLUM'S FIRST ADMISSION OF DISCOVERY ABUSE

59.      After testifying that he could not recall whether Smith ever referred to

himself, Meagher, Doscher and Meyer as partners, Meagher was handed an e-mail to

refresh his recollection, which was authored by Smith on August 21, 2012 written to

Doscher, and copying Meagher and Meyer.  (Merolla Dec., Exhibit 30, p. 897, 941-943).

At first, Mr. Blum objected to the document because it did not contain a Bates number:

> **MR. BLUM**:  Note my objection that this wasn't produced in discovery, as far as
> I know, or at least I don't see a Bates number on it.
> **MR. MEROLLA**: I would note that I agree with Mr. Blum, it was never
> delivered in discovery.  If you look in the middle, it's Drew Doscher,
> ddoscher@theseaportgroup.com, to Steve Smith, ssmith@theseaportgroup.com,
> and they didn't produce it.  So I have some questions myself as to why they didn't
> produce it.  Just to be clear, this was handed to me last night.

---

[4] A Limited Liability Company (LLC) may have Units or Percentage Interests, whereas
corporations have Shares.

**MR. BLUM**: I can answer that question.  <u>We have produced this document</u> except for the top part between Drew Doscher and his lawyer, and the part from Drew Doscher, Seaport Group, to Drew Doscher Hotmail personal account.  <u>We have produced the rest of it.</u>  <u>So I recognize the bottom,</u> I just don't recognize the top.  I don't know the Bates number, <u>but I have seen it.</u>

**MR. MEROLLA**: Then are you withdrawing your objection to using this since you contend that your produced it?

**MR. BLUM**: I am withdrawing it because I am representing that we produced it. Not this, but we produced the parts that involved The Seaport Group, yes.

**MR. MEROLLA**: Can you give me a Bates number?

**MR. BLUM**: Really?

**MR. MEROLLA**: Really.

**MR. BLUM**: We can do that. I don't think it's something to do right now because we're not going very fast.

**MR. MEROLLA**: We have about 20 minutes left.  If you can shoot me an e-mail tonight or tomorrow morning is fine.

(*Id.*)

60.     The follow day, Blum reluctantly admitted that he did not produce this particular document.  (Merolla Dec., Exhibit 31, p. 962).  Doscher then moved for some sanctions since the integrity of the process was now proven to be compromised, insofar as: (1) Mr. Blum recognized the document as something he had seen; (2) misrepresented to the Arbitral Panel that he had in fact produced it; and (3) the document itself went to one of the critical issues in the case: whether the Respondents considered Doscher to be a partner/owner of Seaport.  (*Id.*, p. 963-967).  The undersigned stated that having candor with a tribunal such as the Arbitral Panel was a serious matter, and:

> Now, I don't envy your position.  Been around the block long enough where I know that judges, people in your position don't like to sanction parties and attorneys.  You want to get to the merits and all that.  But that's not your fault, it's not my fault.  Mr. Blum and his clients have put this panel in this position.  **And if you don't do something about it, it tarnishes the integrity of this process.**

Chairwoman Riley stated that she would take the motion for sanctions into consideration at the end of the hearing.  (*Id.*, p. 968).

61.     So what was contained in this e-mail from Smith to Doscher, on August 21, 2012, after working with Doscher for over 3 years, and which that Seaport's counsel Ronald G. Blum recognized as something he reviewed in this case but intentionally withheld in production?

Drew,

I want to start off by saying that I am Very proud to be **partners** with all three of you.  I think that we are on a path to Wall Street history.  Always a long road to anything historic, but we are on the right track.

I waited until I had the appropriate 6-8 white wines so that I could send this in the proper state of mind.

I believe that we all know that we have created something special with Seaport.  I also believe that our personal lives intersect it all the time.  The intersect always created confusion.  I go back to being proud of my **partners**.  First and foremost, money becomes the accepted winner on Wall Street.  While I agree, I think greed in not good.  Good business creates good revenue, creates good clients, a basis for a long term business model.

On the personal side.  It might have been easier for you not to hear from me.  I don't want to stay silent to the fact that I am a little worried about you on a personal basis.  You have an incredible heart and give it to everyone.  I am not the best example as a role model as I order another drink.  I just want to say, if you need me or us for anything in our personal lives, I believe we are all there.  In the same way that I believe that you three will be there in my personal life if I need any of you.  And thank you all for that.

If there is ANYTHING (Miller caps for effect) that I can do, please let me know.

**Your partner**,

Steve Smith

(Merolla Dec., Exhibit 183).

After reviewing this document, Meagher admitted that at <u>no</u> point during 2012 did he tell Doscher that he would lose his Equity Interest if he did not sign an operating agreement.

(Merolla Dec., Exhibit 30, p. 945-946).

## RONALD G. BLUM'S SECOND ADMISSION OF DISCOVERY ABUSE

62.     Towards the end of his cross-examination, after being on the stand for two

days, Meagher insisted:

> Okay, not only was he not an owner of the company, I was thinking about it last
> night, everyone in the company knew he wasn't an owner. All 175 people knew
> he wasn't an owner. Said it in front of the whole company. So everyone knew
> that he was not an owner of the company. Everyone in the company did not hold
> him out to be other than that.

(*Id.*, p. 1085).

But then he was confronted with an e-mail from Eben Perison, a Seaport employee in the

corporate finance department based in Los Angeles, in which he relayed a story regarding

a client in which he mentioned that Doscher was "one of the Seaport partners." (*Id.*, p.

1085-1086). Ronald G. Blum again objected to the document as it was not produced

during discovery, but as was the case in the "Your Partner" e-mail from Smith, this

particular e-mail was once again written to and from Seaport e-mail addresses. (*Id.*) In a

case in which the Respondents delivered over 80,000 pages of documents, it is more than

curious how these two e-mails, which are clearly damaging to Respondents theory of the

case, did not make its way into their production.

**False Seaport Contention No. 2:**     **Doscher's capital account was not "real."**

63.     On direct examination, Meagher testified that he, Smith, and Mark Miller

agreed to share Seaport's profitability with Doscher and Meyer:

> if and when they became members of the company. We're not giving you this
> unless you become <u>partners</u>. So we kept track of the number, it was nothing more
> than a number.

(Merolla Dec., Exhibit 30, p. 840-841).

The agreement took place in 2011, "but the understanding was that it would be

retroactive for the earnings of the company in 2010." (Merolla Dec., Exhibit 31, p. 1122-

1123).  Meagher stated that Doscher "was not an owner of the equity of the company and

the rights and responsibilities associated with that interest."  (Merolla Dec., Exhibit 30, p.

899).  However, Section 5.1 of Seaport's Amended and Restated Operating Agreement

executed on April 15, 2010, made "effective as of March 1, 2009, <u>which reflects oral</u>

<u>agreements among the Members as of the Effective Date</u> which are now being reduced to

writing" provides:

> **A separate capital account ("<u>Capital Account</u>") shall be established**
> **for each member on the books of the Company.**

(Merolla Dec., Exhibit 57).

Meagher admitted that in fact only members of an LLC get capital accounts. (Merolla

Dec., Exhibit 30, p. 936).[5]  It necessarily follows that if a capital account was established

for Mr. Doscher in 2010 and maintained for <u>three years</u> – therefore, he was treated as a

Member/Owner/Partner of Seaport.  Indeed, just as Meagher and Smith made enforceable

"oral agreements" with Miller and Kennedy "effective as of March 1, 2009" that were not

"reduced to writing" until April 15, 2010, so they did with Doscher and Meyer.  That

Doscher's oral agreement was not reduced to writing as of the date of his termination

does not make it any less enforceable.  Regarding the capital accounts, Doscher testified

that he would get a printout stating the balance one or two times per year, usually at year-

end (Merolla Dec., Exhibit 28, p. 279-280), which was corroborated by Meagher

(Merolla Dec., Exhibit 30, p. 899), and Meyer. (Merolla Dec., Exhibit 33, p. 1492-1495).

      64.     Seaport contended the creation of the capital account for Doscher was that

it was "pro forma," a "projection," and "hypothetical."  Meagher explained:

---

[5] Similarly, Section 3.4 of the Amended and Restated Operating Agreement allowed
Members to use Seaport's accountants for their individual returns.  (Merolla Dec.,
Exhibit 57).  Doscher used Povol & Feldman for his 2011 tax return.  (Merolla Dec.,
Exhibit 28, p. 282-283).

> There's no document behind it, there's no – it's not something they could go take
> out of the company.  Until that document is signed we're not giving you that
> money and that's just a record keeping of what that number will be when the
> documents are signed.

(Merolla Dec., Exhibit 30, p. 841).

Turns out, there was never any other Seaport employee for which a capital account was

created other than Doscher that did not become an equity owner. (Merolla Dec., Exhibit

31, p. 1121).  Doscher denies the **IF** was <u>ever</u> posed to him when he first received his

"equity" interest in 2010 (Merolla Dec., Exhibit 27, p. 91-92), or any time thereafter, and

Meagher admitted that the capital account balances presented to Doscher were <u>never</u>

designated as hypothetical numbers.  (Merolla Dec., Exhibit 30, p. 899).  He also

admitted that he <u>never</u> told Doscher that his "equity" account would disappear if Doscher

ever separated from Seaport.  (Merolla Dec., Exhibit 30, p. 895).

     65.    To support this manufactured position that Doscher's capital account was

"pro forma," a "projection," and "hypothetical," Seaport put up Maureen Loftus as an

expert on the subject.  However, on cross-examination, she admitted that she did not see a

single piece of documentation to evidence that Doscher was informed by anyone that his

capital account was "pro forma."  (Merolla Dec., Exhibit 34, p. 2027).  And when she

was asked about a worksheet prepared by Povol & Feldman regarding Capital Account

Allocations for Seaport as of December 31, 2009 and 2010, which identified Doscher as

having a 20% interest "Post 01/01/10 – thereafter" (Merolla Dec., Exhibit 133),  she

admitted that "thereafter" did not mean "pro forma."  (Merolla Dec., Exhibit 34, p. 2028-

2029).  And she admitted that the word "pro forma" was nowhere to be found on the

worksheet.  (*Id.*)  Regarding the same worksheet, when Chairwoman Riley point blank

asked why Doscher was shown as a hypothetical or phantom 20% owner for capital

account allocations for December 31, 2009 and 2010, Meagher responded "that would be a mistake." (Merolla Dec., Exhibit 31, p. 1123). When raising the same issue with Seaport's accountant, Allan Povol, Arbitrator Naughten noted "it's awkward for me to understand." (Merolla Dec., Exhibit 34, p. 1993). Actually, Seaport's "story" is pure fabrication.

66.     Seaport insisted that while the capital accounts created for Doscher and Meyer for 2010, 2011, and 2012 were "hypothetical," those for Meagher and Smith were "real." Meagher specifically testified: "My capital account is a real number. I pay taxes on it. It's an asset that I own, it's cash." (Merolla Dec., Exhibit 30, p. 935). Povol agreed, testifying that Meagher's capital account was his share of equity in the firm that he could "draw out tax free." (Merolla Dec., Exhibit 34, p. 1898-1899). And Smith told the Arbitral Panel that Doscher was not able to draw down on his capital account. (Merolla Dec., Exhibit 32, p. 1421).

67.     But Doscher was actually able to use his capital account as cash for 4 calendar years to the tune of $821,707.26 in personal expenses as indicated in the "Loans & Exchange" account that Seaport wanted reimbursement, as plead in its counterclaim. When Doscher requested personal expenses be taken out of his commission checks, they were not. (Merolla Dec., Exhibit 140). Doscher testified Seaport's Marcus Witthaut told him his personal expenses were being offset against his capital account. (Merolla Dec., Exhibit 27, p. 90). He did in fact use his capital account as an "asset" when he needed to wire $252,525.00 for a litigation bond, and Seaport never made a request or demand for repayment prior to this litigation. There was no written documentation evidencing any sort of loan agreement between Seaport and Doscher regarding these amounts

purportedly now booked internally as a loan.  (Merolla Dec., Exhibit 33, p. 1696-1697)

Doscher was never charged any interest on these "loans."  (*Id.*).

68.     Seaport's accountant, Allan Povol, confirmed that such a course of

conduct was consistent with an "Owner" or "Member" of an LLC, but not for a mere W-

2 employee.  (Merolla Dec., Exhibit 34, p. 1911-1915).  Indeed, if Doscher was just a W-

2 employee, this course of conduct regarding the "Loans" violated I.R.C. § 7872, which

operates to impute interest on below market loans between an employer and an employee.

Among the factors considered when determining whether a loan is *bona fide* include: (i)

whether there is a written document detailing the terms of the loan; (ii) whether the term

is for a set amount of time or "on demand;" (iii) whether the interest rate is at market rate

or below; and (iv) whether the loan is listed on the company's balance sheet as a

receivable.  While the December 31 "Loans & Exchange" balances for the other

"partners" were routinely swept as a distribution at year end, Doscher's balance always

carried over to the next year.  (Merolla Dec., Exhibit 34, p. 1911).  At least it appeared

that way on the documentation provided in discovery – who knows what was inputted on

the native Quickbooks file given to Sobel & Co. in June 2012, which quite likely showed

Doscher's balances were being offset by positive capital account balances the entire time.

69.     Similarly, Meyer was also able to use his "hypothetical" capital account,

when Seaport wired $150,000 on his behalf to invest in a restaurant/bar in 2012.

(Merolla Dec., Exhibit 33, p. 1498-1504).  And just like Doscher's loans, Meyer's loan

was not in writing, did not have a definite term, and carried no interest.  (*Id.*)

70.     Another example of the use of his capital account "as an asset" was the

negotiation among Doscher, Meyer, Meagher and Smith over the allocation of bonuses to

the employees in 2012.  When Meagher and Smith proposed that the departments run by Doscher and Meyer contribute $300,000 to the bonus pool and the "equity" contributes $300,000, Meyer confirmed that resulted in Doscher and Meyer were thus responsible for $225,000 each.  (Merolla Dec., Exhibit 217, p. 194-196).  These were "real" dollars for employee bonuses coming out of Doscher's "real" pocket, not "hypothetical" dollars.

71.      As another example, in June 2012 Doscher offered Meagher to trade his "equity" interest in Seaport for Meagher's ownership interest in the restaurant/bar they invested in together.  (Merolla Dec., Exhibit 31, p. 985-987).  Meagher admitted that he never responded to Doscher that there was not anything to trade because his "equity" in Seaport was not "real."  (*Id.*)  Notably, Meagher ultimately acquired and relinquished his interest in that restaurant/bar without ever executing a written operating agreement.  (*Id.*, p. 987-988).  Such was indeed the course of conduct among these four "partners."

72.      Lastly, Doscher was involved in all the Seaport decisions to reinvest the phenomenal income he brought them in 2010, 2011, and 2012.  For example, Meagher came to Doscher and Meyer to "do something extraordinary" with the "Vanto project" and the "partners," which included Doscher, agreed to invest over $1,000,000 of their money in the project.  (Merolla Dec., Exhibit 30, p. 797-799).  If it was not Doscher's money at stake, why ask him for approval?  As another example, Doscher led Seaport's investment in opening an office in Montauk, which was an extreme success.  (Merolla Dec., Exhibit 27, p. 117-118).  Finally, as the only "partner" with global banking experience, Doscher single handedly led Seaport to expand its footprint to open an office in London.  (*Id.*, p. 106-107).  The license alone was over $3,000,000, which included

Doscher's share of the 2010/2011 profits, and he was appointed director of the European Seaport entity. (*Id.*, p. 107-114).

**False Seaport Contention No. 3:**     **Meagher and Smith "paid taxes" on the 2010 profits.**

73.     Meagher testified that capital accounts were created for Doscher and Meyer because they wanted their share of whatever "the profits were for 2010." (Merolla Dec., Exhibit 30, p. 791-192). Smith testified that he "paid my pro rata share" of the taxes on those capital accounts. (Merolla Dec., Exhibit 32, p. 1419-1420). However, the purported tax returns delivered during discovery and entered into evidence for Seaport for 2010 showed an ordinary business income **loss** of $5,971,254 or $7,252,659, depending on which one, if any, you want to believe was actually filed with the IRS. (Merolla Dec., Exhibits 175 and 177). Meanwhile, a Capital Account Worksheet produced by Seaport showed 2010 income on $7,615,389.33 for the broker-dealer entity Sea Port Group Securities, LLC, income of $8,156,791.52 for Seaport V, LLC, but a **loss** of $4,583,130.34 for The Seaport Group, LLC. (Merolla Dec., Exhibit 136). Meagher initially testified that the members of Seaport paid taxes on the 2010 profits, but once confronted with these tax returns, reversed himself and said that he could not tell "from an accounting standpoint whether we were profitable in 2010." (Merolla Dec., Exhibit 31, p. 1011-1012).

74.     Astoundingly, Smith testified that he was "not surprised" that two different tax returns were delivered during discovery, because "you have tax accounting and partnership accounting." (Merolla Dce., Exhibit 32, p. 1308-1309). Remarkable. With no one able to verify what tax returns were actually filed, and the refusal to deliver the native QuickBooks file, while not being able to see a single bank statement, how in

the world could Doscher evaluate, much less present, a calculation of the "real" profits

(or losses) of Seaport for 2010 (and 2011 and 2012)?

**False Seaport Contention No. 4:** **Doscher's refused to sign an operating agreement, so he lost his "equity" tracked over the prior 3 years.**

75. Regarding the capital account that Seaport tracked for three years, Seaport's counterclaim alleges that because Doscher "chose not to become a member of Seaport he was not entitled to any monies in that account." (Merolla Dec., Exhibit 6). According to Seaport, the big **IF** to convert the "pro forma" into reality was for Doscher to execute a written operating agreement. (Merolla Dec., Exhibit 31, p. 976). At trial, Meagher testified that there was not any meaningful conversation about the proposed document. (*Id.*, p. 1009). This turned out to be untrue. In fact, Doscher did engage in substantial negotiations, and he was never given a "signable" document.

76. The first was sent to Doscher on May 24, 2011. (Merolla Dec., Exhibit 204). The document was titled "Third Amended and Restated Operating Agreement," and had signature lines for five individuals – Meagher, Smith, Mark Miller, Doscher, and Meyer. (*Id.*) Subsequently Miller withdrew from any Seaport operations in January 2012. (Merolla Dec., Exhibit 27, p. 92-93). In April 2012, Doscher and Meyer hired Sobel & Co. as their forensic accountants to review Seaport's books and records before signing any operating agreement. (Merolla Dec., Exhibit 208). After receiving information and documentation from Seaport through various sources, Sobel & Co., issued a summary report in December 2012. (Merolla Dec., Exhibit 209).

77. A few weeks before that, on November 19, 2012, Doscher's attorney inquired about getting a copy of the "Second Amended and Restated Operating

Agreement," since the draft he was reviewing was the "Third," to which Ronald G. Blum

replied: "we never prepared the Second Amended Agreement." (Merolla Dec., Exhibit

205). The next draft delivered by Blum on November 20, 2012 was identical to the one

he sent in May 2011, containing signature lines for Mark Miller, included assets for

Seaport V, LLC (which was no longer a subsidiary of The Seaport Group, LLC as of

September 2012, unbeknownst to Doscher), listed a number of defunct subsidiaries, and a

laundry list of "Class A" assets with market values as of May 2011. (*Id.*) Subsequently,

on December 19, 2012, Doscher's attorney personally met with Ronald G. Blum to

discuss the draft operating agreement, and Blum delivered a new draft, which was

essentially the same draft, still containing signature lines for Mark Miller, including

assets for Seaport V, LLC, listed a number of defunct subsidiaries, and a laundry list of

"Class A" assets with market values as of May 2011. (Merolla Dec., Exhibit 186).

78.     A few weeks later, in the midst of the Greektown dispute, Meagher

organized an off-site meeting with Smith, Meyer and Doscher to discuss "many open

items issues regarding <u>our partnership</u> and all of the different business lines at Seaport."

(Merolla Dec., Exhibit 145). Notably, Meagher did not say "our <u>potential</u> partnership."

79.     The following day, at the off-sit meeting (which Doscher could not attend

because he had the flu), <u>Meagher agreed to deliver a new "streamlined draft" within the

next two weeks</u>. (Merolla Dec., Exhibit 147). He testified he did so because Meyer told

him at that meeting that:

> There's a lot of stuff in there that doesn't really matter. So I said I need to
> move this along. How about if I cut out all the paragraphs that aren't
> meaningful to make it simpler for you guys. And he said great. And I agreed
> to do that within two weeks.

(Merolla Dec., Exhibit 31, p. 1009-1010).

Three days later, Doscher was terminated as a Seaport employee before ever seeing Meagher's "simpler" draft.

80.     Presumably, at a minimum, the "simpler" draft would at least involve the deletion of Seaport V, LLC as a subsidiary among others, the Class A assets previously list, and who knows?  Meyer was asked by Arbitrator Littlejohn if the operating agreement he signed in May 2013 had any changes from the one delivered when Drew was still at Seaport, and Meyer testified "I don't know."  (Merolla Dec., Exhibit 33, p. 1562).  Meyer testified he was generally disinterested in the process and "would have signed anything they put in front of me, as long as my lawyer told me it was signable." (*Id.*)  But just how "simpler" the next draft was remains unknown at this point because the Arbitral Panel refused to order its production on numerous occasions.

**False Seaport Contention No. 5:     Doscher resigned from Seaport.**

81.     Meagher is a Cornell Law graduate, so he knows that there needs to be an offer before there is an acceptance.  He is a 30 year Wall Street veteran, and was "partners" with Doscher for 3½ years, so he also knows what hard-nosed negotiation is.  Plus, he knows Doscher has a history of threatening to quit Seaport, but never following through.  (Merolla Dec., Exhibit 31, p. 986).  The record in this case is completely devoid of any evidence that Doscher tendered his resignation.

82.     Rather, the e-mail and text message communications indicates that he was threatening to resign over the Greektown dispute if Seaport employee Greg Bousquette was not terminated.  (Merolla Dec., Exhibit 28, p. 336-357).  Unbeknownst to Doscher at the time, Meagher was coordinating a manufactured "acceptance of a resignation" with public relations consultant Mark Arena and coordinated press coverage of the event with

Bloomberg News.  (Merolla Dec., Exhibits 148 and 149).  The press coverage was perhaps also a "thank you" *quid pro quo* from Bloomberg News anchor Stephanie Ruhle for Meyer letting her use his apartment after Hurricane Sandy.  (Merolla Dec., Exhibit 33, p. 1525-1526).

83.     Doscher testified that he was "willing to bend" on the Greektown issue, but was not given the chance.  (Merolla Dec., Exhibit 29, p. 555).  Maybe he would have resigned the following day, maybe he would not have.  We will never know since Seaport cut him off and manufactured a story with Bloomberg.  But the fact is, he did not resign. Rather, he was terminated before ever getting a chance to review Meagher's "simpler" draft operating agreement to satisfy the purported **IF** condition to the Equity Interest converting from "pro forma" to "reality."

**False Seaport Contention No. 6:     Only "Members" get Guaranteed Payments.**

84.     Meagher testified (correctly) that Members of an LLC receive "Guaranteed Payments" instead of W-2 wages.  (Merolla Dec., Exhibit 31, p. 1071). Seaport's accountant Allan Povol corroborated this.  (Merolla Dec., Exhibit 34, p. 1897). Povol also testified that a Member's Guaranteed Payment should never exceed the equivalent of W-2 wages for earnings, sales commissions in the case of Seaport.  (*Id.*) Notably, Meagher's Guaranteed Payments exceeded his sales credits by approximately $4,000,000 in 2010.  (*Id.*, p. 1896-1897).

85.     It necessarily follows that if Doscher was only an at-will employee, that he would only receive W-2 wages, and there would be no reason to create a Guaranteed Payments Item in Seaport's internal accounting on Quickbooks.  But in fact, he **was** created a Guarantee Payments Item **in 2010**.  (Merolla Dec., Exhibit 33, p. 1694).  When

confronted with this, Meagher had no explanation for why a Guaranteed Payments Item journal entry was created for Doscher in 2010. (Merolla Dec., Exhibit 31, p. 1084-1085).

86.     As described earlier, one of the quirks to the Quickbooks computer program is that once an "Item" such as "Guaranteed Payments" is created, it can <u>never</u> be deleted. (Merolla Dec., Exhibit 280). However, the individual entries within that Item can be entered and deleted without any tracking of the history. (Merolla Dec., Exhibit 34, p. 1921-1922).

87.     Interestingly, Doscher was not the only non-"Member" to have a Guaranteed Payments Item "mistakenly" created – Meyer had one created for him <u>**in 2010**</u> as well. (Merolla Dec. Exhibit 34, p. 1919-1920). And it turns out that Patrick Kennedy, who was a Member until April 2010, actually received Sales Credits instead of Guaranteed Payments. (Merolla Declaration dated January 20, 2015, Exhibit B, Trial Exhibit 131, Section 5(h), SDD0100029, Cell 16945). Notably, Smith never considered Kennedy to be a "partner." (Merolla Dec., Exhibit 32, p. 1311). Just a few more "mistakes" by Seaport that tend to show Doscher was considered an owner as early as 2010 and the Equity Interest was "real."

## DOSCHER'S MOTION FOR SANCTIONS BEFORE CLOSING ARGUMENT

89.     Doscher made one last application to the Arbitral Panel on the morning of the last day just before closing arguments were to begin, given Povol's admission that he gave Sobel & Co. Seaport's Quickbooks file in June 2012, <u>over six months before Doscher was terminated</u>. This testimony, from Seaport's own certified public accountant, was diametrically opposed to the blatantly false representations made by Ronald G. Blum

and Prana Topper in their letter dated May 21, 2014 in opposition to a motion for

sanctions and a continuance (to which they objected), that:

> **We said that neither Respondents nor their accountants, Povol & Feldman,**
> **had a copy of <u>or knew</u> what documents were on the "thumb drive" provided**
> **to Sobel in June 2012.**

(Merolla Dec., Exhibit 23, p. 1-2).

This letter, authored by both Mr. Blum and Ms. Topper was intended to deceive the

Arbitral Panel in making a decision on the motion, and thwart a legitimate discovery

request <u>and existing Order compelling production</u>, in violation of the duty to cooperate as

required by FINRA Rule 13505.   In this letter, Mr. Blum and Ms. Topper also blamed

Doscher for not being able to get the "thumb drive" from Sobel & Co..  Apparently, it

turns out that their clients Meagher and Meyer directed Sobel to not deliver the files to

Doscher, quite likely on the very advice and counsel of Mr. Blum and Ms. Topper.

Regarding the "thumb drive," Ms. Blum and Ms. Topper represented:

> **We do not have it or a list of what was on it.  The only entity that may have**
> **the thumb drive is Claimant's own accountants, Sobel.  This arbitration**
> **should not be put off because of Claimant's fee dispute or fraud lawsuit.**
> **These are not Respondents' issues and Claimant should not use them to try**
> **to obfuscate this case, particularly when Claimant never asked this Panel for**
> **a subpoena to Sobel.**
>
> ........................
>
> **The Panel ordered Respondents to produce documents that were provided to**
> **Sobel (Ex. A at 3).  That is what Respondents did.**

(*Id.*, p. 2-3).

And consistent with Respondents' refusal to produce the documentation it gave to Sobel

in June 2012 because they "didn't know" what was given, which turns out to be false,

Sobel refused to produce anything to Doscher in the District Court case (*Doscher v. Sobel*

*& Co., LLC, et.*al, USDC SDNY Case No. 14 CV 646), because of, and at the very

<u>insistence</u> of Seaport's Meagher and Meyer.

90.     Respondents were also ordered to produce Seaport's federal and state tax returns and the associated K-1 schedules, and not a single witness could testify as to which, if any, of the returns and schedules were actually filed with the IRS.  Now, Ms. Topper did represent that the she was turning over "the complete 2011 tax return" after the lunch break on the last day of evidence (Merolla Dec., Exhibit 34, p. 1976), but why should anyone believe a word from her at this point?  All this coming off the heels of Mr. Blum objecting to the use of a document (the Smith "You Partner" e-mail) that he recognized from Seaport's e-mail server, then falsely represented the document was produced, only to later recant that statement.

91.     Given the intentional deception from Mr. Blum and Ms. Topper, and the willful violations of multiple discovery Orders, Doscher made a motion before the Arbitral Panel seeking the following relief: (1) issue preclusion regarding the validity of his Equity Interest; (2) dismissal of Seaport's Counterclaim; and (3) alternatively postpone the conclusion of the proceedings until Doscher receives whatever Sobel has in its possession.  (Merolla Dec., Exhibit 35, p. 2073-2081).

92.     In opposition, Ms. Topper had the audacity to state that "no one in this room I think knows what was given to Sobel and not given to Sobel." (*Id.*, p. 2082).  She then said that she and Mr. Blum "represented that we did not have a copy of what was given to the Sobel firm, that is correct."  (*Id.*, p. 2083).  Conveniently, she left out the prior representations neither Respondents, nor Povol & Feldman "knew" what documents were on the "thumb drive." (Merolla Dec., Exhibit 23, p. 1-2).  She then represented that the different tax returns was "an administrative error, I think everyone in this room knows that."  (Merolla Dec., Exhibit 35, p. 2086).

93.    Chairwoman Riley then took a recess with the other two panelists, and when she returned she announced that Seaport was ordered to deliver the original Quickbooks native file originally requested. (*Id.*, p. 2091-2092). Doscher then asked if the Arbitral Panel would direct Meyer to give his consent to Sobel, so that Doscher could receive what Sobel received in June 2012. (*Id.*, p. 2092). In response, Mr. Blum suggested that "we agree to a subpoena to Sobel, get them to appear at the next hearing." (*Id.*) Doscher had no objection to issuing a subpoena to Sobel, but continued to request the Arbitral Panel direct Meyer to give his consent to Sobel to deliver the documentation and information to Doscher.[6]  The motion was then deemed submitted without a ruling, and the parties delivered their closing arguments. (*Id.*, p. 2125-2184). The Award denied all of Doscher's motions for sanctions and for further discovery.

## HOW THE DISCOVERY ABUSE AFFECTS THE EQUITY INTEREST ISSUE

94.    The mandate of FINRA Rule 13505 is clear: "The parties must cooperate to the fullest extent practicable in the exchange of documents and information to expedite the arbitration." Respondents were hell bent on the "expedite" part of the rule; not so much on the "cooperate" part. In addition, the FINRA rules obligate parties to act in good faith when responding to discovery requests. "Good faith" means that a party must use its best efforts to produce all documents required or agreed to be produced. FINRA Rule 13507(b). That simply did not happen in this case, in which Seaport had exclusive possession, custody, and control of the financial information relating to Doscher's Equity Interest. Section 10(c) of the FAA is violated when the arbitrators fail to insure that

---

[6] FINRA Rule 13513(b) gives the Arbitral Panel the authority to direct an Associated Person (which Meyer is one) to produce documents in his "possession or control." Meyer and Meagher, quite likely on the advice of Blum and Topper, "controlled" the non-production of documents by Sobel & Co.

relevant documentary evidence in the hands of one party is fully and timely made available to the other, and prejudice is shown. *Home Indemnity Co. v. Affiliated Food Distrib.*, 1997 U.S. Dist. LEXIS 19741 (Dec. 12, 1997 S.D.N.Y.), *citing Chevron Transport Corporation v. Astro Vencedor Compania Naviera, S.A.*, 300 F. Supp. 179, 181 (S.D.N.Y. 1969). When a party's basic right to present and test evidence on issues has not been accorded, vacatur is warranted pursuant to Section 10(c). *Cofinco, Inc. v. Barkie & Bros.*, 395 F. Supp. 613, 615 (S.D.N.Y. 1975).

95.     Despite originally ruling in favor of Doscher's motion for sanctions just before closing arguments, and the parties agreeing to the issuance of a subpoena on Sobel & Co., at no point did the Arbitral Panel allow Doscher to retrieve information from someone outside the control of Seaport. Not from the IRS, not from Povol & Feldman, not from anyone. Meanwhile, Doscher had sued Sobel & Co. for not delivering its work product to its client (Doscher), and it turns out the reason was that Meagher and Meyer directed them not to, and actually were paid off by Seaport in December 2013. (Merolla Dec., Exhibit 279).

96.     How Seaport was treating its internal accounting, as evidenced by the native QuickBooks file given to Sobel six months before the Greektown dispute came to a head, and two months before Smith delivered the "Your Partner" e-mail to Doscher, is material to the issue of whether Doscher's Equity Interest was "real" or "hypotehical." Whether Seaport delivered legitimate financial information, like the Annual Capital Account balances presented to him and the purported tax returns, is material to whether the **IF** condition was even a real condition. And willful violations of orders, even from an arbitration panel, <u>must</u> have consequences. In this case, there was absolutely no

consequence to the sharp litigation tactics of Respondents and their counsel, which

included fraudulent statements from Mr. Blum and Ms. Topper.[7]  As stated by Justice

Bennett from the Northern District of Iowa:

> Unless judges impose serious adverse consequences, like court-imposed
> sanctions, litigators' conditional reflexes will persist. The point of court-imposed
> sanctions is to stop reinforcing winning through obstruction.

*Abbott Laboratories*, 299 F.R.D., at 597, (N.D. Iowa 2014).

If there are no consequences to discovery abuse, why ever bother to cooperate?  In this

case, on the Equity Interest issue, Respondents won through obstruction and deceit.

97.     As such, vacatur is warranted under both a Section 10(c) basis and a

finding of "manifest disregard."  Under the "manifest disregard" ground for vacatur,

arbitrators must appreciate the existence of a clearly governing legal principle but decide

to ignore or pay no attention to it."  *AXA Belguim*, at *34-35. The Arbitral Panel had

knowledge of the FINRA Rules and the law since they originally <u>granted</u> Doscher's

motion, but then denied all motion relief in the Award.  While by no means is a FINRA

Arbitration Panel obligated to deliver an Explained Decision, the fact that it failed to do

so can be taken into account when determining "manifest disregard," and the absence of

an explanation may reinforce the reviewing court's confidence that the arbitrators

engaged in manifest disregard.  *Halligan v. Piper Jaffray, Inc.*, 148 F. 3d 197, 204 (2d

Cir. 1998).  In this case, Doscher requested an Explained Decision, and the Respondents

objected.  (Merolla Dec., Exhibit 28, p. 478-481).  The Panel chose to not issue an

Explained Decision. (Merolla Dec., Exhibit 29, p. 488).

---

[7] While apportioning the costs equally between the parties, the Arbitral Panel taxed
Doscher 100% of the adjournment fees associated with the continuance.  (Merolla Dec.,
Exhibit 1, p. 4).

## VACATUR ON THE EQUITY INTEREST CLAIMS

98.     Given the discovery abuse and lack of veracity concerning what financial information was delivered in discovery and entered into evidence, the totality of the record warrants the Award be vacated on Doscher's claims related to his Equity Interest. Those being for a legal and equitable accounting, securities fraud, promissory estoppel, breach of contract, breach of fiduciary duty, declaratory judgment, alter ego and a constructive trust.  Doscher was denied his basic right to present and test evidence on these Counts. *Cofinco, Inc. v. Barkie & Bros.*, 395 F. Supp. 613, 615 (S.D.N.Y. 1975).

99.     The discovery abuse complained of herein without question goes to the critical facts that tend to prove or disprove:

1.  Whether Doscher was treated as an equity owner from 2010-2012;

2.  Whether the Equity Interest was in fact "real" and not "hypothetical;"

3.  The value of Seaport's net profits for 2010, 2011, and 2012;

4.  Whether Seaport was delivering false tax information to induce Doscher to sign a proposed operating agreement; and

5.  Whether Seaport ever delivered a "signable" operating agreement for Doscher to execute, to satisfy the manufactured **IF** condition.

Just before closing arguments began, Blum moved the Arbitral Panel to bifurcate the issue because "the evidence is overwhelming" that Doscher does not have an Equity Interest, "and if he doesn't have this interest then the issues before the Panel are quite different." (Merolla Dec., Exhibit 35, p. 2100).  That motion to bifurcate was denied. (*Id.*, p. 2106).  The controlling law was expressly set forth in Doscher's post-trial brief (Merolla Dec., Exhibit 281), but rather than deal with the profound discovery abuse and

admittedly non-compliant document production, all throughout being tendered in a most uncooperative manner and in clear bad faith, the Arbitral Panel chose to ignore it.

100.    Doscher should be permitted additional disclosure regarding the Equity Interest claims in the form of: (1) Seaport's tax returns directly from the IRS; (2) Seaport's QuickBooks files; and (3) Seaport's May 2013 operating agreement and its merger documentation with Global Hunter.

### 1.    Seaport's Tax Returns.

101.    Seaport was repeatedly ordered to produce tax returns, once in the middle of trial, and no witness could verify which returns were actually filed.  Mr. Blum admitted that the tax returns given to Sobel were not legitimate, yet he never disclosed that fact prior to trial.  During trial, Meagher testified that the capital account balances were a function of "the profits of the company from the years 2010, '11, and '12 and we divided it by 5."  (Merolla Dec., Exhibit 30, p. 899-900).  When presented with two sets of 2009 K-1's, he asked, why would there be two K-1's for 2009?  (Merolla Dec., Exhibit 30, p. 885-886).  Meagher could not identify which K-1 was filed with the IRS.  (*Id.*)  Similarly, Meyer said that he had no idea there were two sets of 2010 tax returns until it was brought up the day before.  (Merolla Dec., Exhibit 33, p. 1496-1497).  And Smith was "not surprised" that two different tax returns were delivered during discovery, because "you have tax accounting and partnership accounting."  (Merolla Dec., Exhibit 32, p. 1308-1309).

102.    Regarding the tax returns, Seaport's tax-matters partner Meagher suggested "that someone who either prepared these or the final copies of these tax returns would be more effective" to answer the questions being posed.  (Merolla Dec., Exhibit

30, p. 888-889). He could not state whether a 2010 tax return put in front of him was in fact delivered to the IRS. (Merolla Dec., Exhibit 31, p. 1015). Seaport's CFO Markus Witthaut testified he was not at all involved in any of the tax return preparation. (Merolla Dec., Exhibit 33, p. 1701). Seaport's tax-preparer Allan Povol was completely unable to verify anything during his testimony:

- When asked if a particular return placed in front of him was ever filed with the IRS, he testified: "**I would need to look at my office computer to determine which was the final return that was filed**." (Merolla Dec., Exhibit 34, p 1827).

- When asked if he ever filed an amended return for 2010, he replied: "**I would have to check in my office**." (*Id.*, p. 1829).

- When asked about a cover letter referencing an amended New York tax return, he said: "**I would have to check in my office, but it appears that we may have**." (*Id.*, p. 1830).

- When confronted with the two 2010 tax returns and asked to confirm which one was actually filed with the IRS, he testified: "**I would need to check in my office which was the final version**." (*Id.*, p. 1836).

- When asked whether the 2009 tax return was ever amended, he said: "**I would have to look in my office**." (*Id.*, p. 1842-1843).

- When asked which of two 2009 K-1s for Meagher was filed with the IRS, he responded: "**I have to look and see which one got submitted**." (*Id.*, p. 1849).

103.   The foregoing questions and answers, and the unwillingness of the Arbitral Panel to compel substantive responses and allow Doscher to get the information directly from a third-party source – the IRS – is precisely the reason why pre-trial depositions and non-party subpoenas would have been prudent and also expedited the trial. The production of the actual tax returns submitted to the IRS, in a case involving allegations of fraud, and where not a single witness could identify which were the "final" versions (with new returns being tendered even on the last day of evidence), are material

for a number of Doscher's claims.  First, for a Legal and Equitable Accounting.  Doscher was given a capital account (hypothetical or real), and he is entitled to an accounting to calculate the "net profits" in 2010, 2011, and 2012.  Meagher stated that the capital account balances were a function of "the profits of the company from the years 2010, '11, and '12 and we divided it by 5." (Merolla Dec., Exhibit 30, p. 899-900).  Second, whether "real" tax returns were given to Sobel during the due diligence investigation and audit.  If not, that's fraud.  If fraud, there was never a legitimate operating agreement to execute, and the alleged **IF** condition to "get" the "equity" is waived as a matter of law pursuant to Frustration of Purpose principles.

### 2.     QuickBooks Native File for Seaport's Internal Accounting.

104.    Completely denying Seaport's counterclaim is diametrically inconsistent with the denial of Doscher's claim for an accounting.  There is no other possible explanation for Seaport to not get reimbursed for $821,707.26 in admittedly personal expenses, except that Doscher was in fact offsetting those expenses against his "real" capital account balance.  And if Doscher did in fact have a capital account balance, he is entitled to an accounting.

105.    "Under 10 Del. C. § 1522 any partner may demand an accounting when: (1) that partner is wrongfully excluded from partnership affairs; (2) there is a breach of a fiduciary duty (as provided by § 1521), and (3) where other circumstances render an accounting just and reasonable." *Nero v. Littleton*, 1998 Del. Ch. LEXIS 57, at *14-16 (Del. Ch. Apr. 30, 1998); *see also Schuss v. Penfield Partners, L.P.*, 2008 Del. Ch. LEXIS, *37 (Del. Ch. June 13, 2008).  In the present case, Doscher has been wrongfully excluded from access to Seaport's affairs, when he was held out as partner, and given a

capital account to allocate net profits of various entities. Doscher's ownership is reflected by:

- the establishment of a capital account and a "Guaranteed Payment" Item in Quickbooks;

- use of Seaport accountants for 2011;

- The use of a Seaport American Express card for his personal expenses;

- Directing a wire in the amount of $252,525.00 on July 20, 2013;

- Being included on decisions to invest in Europe and Vanto, which involved the "35%" managed by Meagher to which net profits would be distributed to the partners;

- His "Partner" business card;

- Written representations from Smith being "Very proud" to be "partners" with Doscher, Meagher and Meyer; and

- Meagher and Smith have a pattern of making oral agreements deviating from the written documents in place.

106.    Production of the native Quickbooks files, from Seaport, Povol & Feldman, and Sobel & Co., is warranted based on the testimony given at trial that contradicted the representations made by Seaport's counsel during discovery.  This would include all the "backups" from 2012 that Seaport's CFO Markus Witthaut gave Povol. (Merolla Dce., Exhibit 33, p. 1698).  It is necessary to be able to see whether there were additional inputs in Doscher's (and Meyer's) Guaranteed Payments Item, which was created in 2010, and what the previous entries were, as an indicia of being treated as a "real" owner.  It is necessary to be able to calculate Seaport's net profits for 2010, 2011,

and 2012. It is necessary to identify how much was in Doscher's capital account when he was terminated, as Arbitrator Naughten asked Smith if he had any idea how much was in his capital account on the date of separation. Smith's reply: "I have no idea." (Merolla Dec., Exhibit 32, p. 1420).

107.    Material inquiries at trial were left unanswered because the Respondents unequivocally did not comply with discovery Orders from the Arbitral Panel. For example, when examining Povol on one of the numerous $100,000 "credit" transfers to Daniel Romualdez Architects that were entered against Meagher's "Loans & Exchange" account,[8] Povol asked to "double click" on the Excel entry he was shown on the computer screen in order to see the corresponding "debit" entry. (Merolla Dec., Exhibit 34, p. 1903-1904). When he was informed that there was no way to "double click" on any particular entry because the Respondents only produced the documents in Excel, Povol was surprised:

> A.    **This isn't the QuickBooks?**
> Q.    This isn't the QuickBooks.
> A.    **You need the QuickBooks to do it, there's no other way to do it.**

(*Id.*)

108.    Recall, this was the process Blum encouraged, objecting to any continuance of the final hearing notwithstanding the failure to adequately respond to discovery, because Doscher "may inquire at the hearing." (Merolla Dec., Exhibit 19, p. 4). Well, Doscher did inquire at the final hearing, and non-compliance with the prior discovery orders was identified, not rectified, and Doscher was clearly prejudiced. Under

---

[8] Meager said the repeated $100,000 wires were sent because "our lives are run through that accounting department. If I needed $100,000 to pay our bills, I would have Markus wire that from the Sea Port Group to Daniel Romualdez Architects where we had a joint account. That was how I go paid.") (Merolla Dec., Exhibit 31, p. 1067); Smith described Seaport's profitability as "one big pile of money." (Merolla Dec., Exhibit 32, p. 1419).

these particular facts and circumstances, Doscher's basic right to present and test evidence on relevant issues was not accorded due to the misbehavior of Respondents. And the Arbitral Panel let them get away with it without consequence.

**3.     Operating Agreement and Merger Documentation.**

109.    The terms of the subsequently signed operating agreement among Meagher, Smith, and Meyer in May 2013 after Doscher's termination goes to the very heart of the contested contention that Doscher's Equity Interest was contingent on **IF** he signed a written operating agreement.  Meagher testified that on January 8, 2013 he agreed to take out "a lot of stuff in there that really doesn't matter" after hearing from Meyer.  (Merolla Dec., Exhibit 31, p. 1010).  This is an admission that they never gave a legitimate operating agreement to sign, and therefore accomplish the alleged condition precedent.  Meagher's cross-examination got cut-off by the Arbitral Panel when asking if Seaport V was still listed as a subsidiary in the May 2013 operating agreement.  (*Id.*, p. 1111-1113).  Meyer could not remember if there were any changes.  (Merolla Dec., Exhibit 33, p. 1562).

110.    Similarly, Seaport's merger with Global Hunter is tied to the consequence of Doscher retaining his Equity Interest.  It also goes to the alter ego claims and a successor in interest should this case be remanded.

**MODIFICATION ON THE SILVERPOINT AWARD**

111.    Doscher also seeks to modify that portion of the Award related to the "specific performance" award for Silverpoint, pursuant to 9 U.S.C. § 11(a), as there was an evident material miscalculation of the "50% payout to Claimant and co-covering salesperson split equally."  There was no evidence in the trial record that there existed

any "co-covering salesperson" regarding the Silverpoint portion of the Fairfield Sentry trade. (Merolla Dec., Exhibit 28, p. 470-475). Doscher should be Awarded the entirety of the "50% payout" for Silverpoint's Fairfield Sentry transaction.

## CONCLUSION

112.   Section 10(a)(3) of the FAA authorizes vacating an arbitration award where the arbitrators refused "to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." Section 10(a)(3) is violated when the arbitrators fail to insure that relevant documentary evidence in the hands of one party is fully and timely made available to the other, and prejudice is shown. *Home Indemnity Co. v. Affiliated Food Distrib.*, 1997 U.S. Dist. LEXIS 19741 (Dec. 12, 1997 S.D.N.Y.), *citing Chevron Transport Corporation v. Astro Vencedor Compania Naviera, S.A.*, 300 F. Supp. 179, 181 (S.D.N.Y. 1969). Under the "manifest disregard" basis, arbitrators must appreciate the existence of a clearly governing legal principle but decide to ignore or pay no attention to it." *AXA Belguim*, at *34-35. Doscher was denied his basic right to present and test evidence on his claims regarding the Equity Interest, and therefore, vacatur is warranted under Section 10(a). *Cofinco, Inc. v. Barkie & Bros.*, 395 F. Supp. 613, 615 (S.D.N.Y. 1975). The Award may also be vacated for a manifest disregard of law.

113.   In furtherance of his claims regarding the Equity Interest, during discovery Doscher sought: (1) Seaport's internal accounting records; (2) Seaport's tax returns; (3) all documentation Seaport delivered to Sobel & Co.; (4) Seaport's subsequent operating agreement purportedly executed by Meagher, Smith and Meyer five months after

Doscher's termination in May 2013; and (5) Seaport's merger documents with Global

Hunter.  The first three categories were ordered to be produced, and the last two were not.

114.    With respect to the Sobel & Co. documentation, Seaport's counsel

represented that neither Respondents nor Povol and Feldman had or knew what was

given to Sobel in June 2012.  Seaport then produced certain internal accounting records

in Excel format, and argued against production in native QuickBooks format because the

information "as one would expect, is voluminous and most of it in no way concerns this

case."  But at trial, Allan Povol acknowledged giving Sobel & Co. a copy of Seaport's

internal accounting on QuickBooks in native format.  Also at trial, Seaport's CFO stated

that he would periodically send Seaport's QuickBooks files to Seaport's accountants

Povol & Feldman "in backups," and Allan Povol said that "there's a way to cut the years"

when delivering an electronic version of Quickbooks. And it appears, Sobel & Co. did

not produce its file to Doscher because Seaport's Meagher and Meyer, likely on the

advice of Blum and Topper, directed them not to do so.

115.    Regarding the tax returns and the K-1s, Seaport was repeatedly ordered to

produce them, once in the middle of trial, and no witness could verify which returns were

actually filed.  During trial, Blum admitted that the tax returns given to Sobel were not

legitimate, yet he never disclosed that fact prior to trial.  FINRA Rule 13505 expressly

states: "The parties must cooperate to the fullest extent practicable in the exchange of

documents and information to expedite the arbitration."  That simply did not happen.

116.    And in spite all the evidence of discovery abuse, the failure to cooperate,

and the admission by Meyer that he and Meagher were responsible for Sobel & Co. not

cooperating with Doscher, Respondents argued in the post-hearing brief:

> **Claimant and his counsel decided to sue Sobel & Co. and Mr. Meyer's former counsel. That suit ensured that Sobel & Co. would not provide documents. Respondents are not responsible for Claimant's strategy, and Claimant cannot now use that strategic decision to extract an advantage in this case.**

(Merolla Dec., Exhibit 282, p. 13).

Arguments such at this, belied by their client's own testimony and made in complete disregard for the truth, is precisely the result that occurs when "judges so often ignore this conduct, and by doing so reinforce – even *incentivize* – obstructionist tactics." *Abbott Laboratories,* 299 F.R.D., at 596-597.

117.    In this case, the problem is exacerbated because of the strong presumption in favor of enforcing arbitration awards. But there has to be bounds to an arbitration panel unwilling to enforce its own orders and directives to satisfy their personal desire to "get it over with;" otherwise, courts would <u>never</u> be allowed to review them. Thankfully, that is not the law in this Circuit. An arbitration panel cannot have unlimited and absolute discretion with respect to managing their cases. The process needs to bear some rationality to due process. That the Arbitral Panel initially ruled that further discovery was warranted and then did <u>nothing</u> about it, without consequence and without explanation, strains credulity. The integrity of the process was indeed tarnished.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Petitioner respectfully requests an Order and Judgment on his Petition as follows:

(1) Vacating that portion of the Award regarding Doscher's Equity Interest, and remand for further proceedings after Doscher receives all the relevant documentary evidence in the possession, custody and control of Seaport and Sobel & Co., and the relevant tax returns directly from the IRS;

(2) Modify that portion of the Award regarding the "specific performance" award for Silverpoint, such that Doscher receives the "50% payout" without any split to a "co-covering salesperson;" and

(3) That Petitioner be awarded any such other and further relief that to this Court seems just and proper.

A. Todd Merolla (AM 6938)
MEROLLA & GOLD, LLP
75 14th Street, Suite 2130
Atlanta, Georgia  30309
Tel.: 404-888-3772
Fax: 404-888-3737
atm@merollagold.com

Attorneys for Petitioner
DREW DOSCHER

# EXHIBIT A

# Bloomberg

## Jefferies's Doscher Gets $2.3 Million From Seaport Group

By Zeke Faux - Oct 29, 2014

Drew Doscher, the distressed-debt trader who had sought $15.5 million in a compensation dispute with former employer Seaport Group LLC, was awarded $2.3 million.

Seaport also must pay Doscher, who now works for Jefferies Group LLC, his share of commissions if some pending trades settle, according to an Oct. 22 ruling by arbitrators at the Financial Industry Regulatory Authority, which oversees U.S. brokerages. As usual, the panel didn't explain its decision.

"We are very gratified by the panel's decision," Ron Blum, a lawyer for Seaport, said in an e-mailed statement. "We are glad to have this matter behind us."

Doscher didn't respond to messages seeking comment today. Richard Khaleel, a Jefferies spokesman, declined to comment.

Doscher left Seaport in January 2013 after a dispute with co-founders Michael Meyer and Michael Meagher, a person familiar with the matter said at the time. He joined Jefferies, a unit of New York-based Leucadia National Corp. (LUK), last October, replacing distressed-debt trading chief Rohit Bansal, people with knowledge of the matter said then.

Doscher also is an owner of the Sloppy Tuna, a bar and restaurant in Montauk, New York, according to a 2012 report in the East Hampton Patch news website.

To contact the reporter on this story: Zeke Faux in New York at zfaux@bloomberg.net

To contact the editors responsible for this story: Peter Eichenbaum at peichenbaum@bloomberg.net David Scheer

®2014 BLOOMBERG L.P. ALL RIGHTS RESERVED.

# EXHIBIT B

**FINRA ARBITRATION Submission Agreement**
Claimant(s)

| | |
|---|---|
| IN THE MATTER OF ARBITRATION ) | **FINRA DISPUTE RESOLUTION** |
| BETWEEN ) | **ARBITRATION NO.** _____ |
| ) | |
| DREW DOSCHER, ) | |
| ) | |
| Claimant, ) | |
| ) | |
| v. ) | |
| ) | |
| SEA PORT GROUP SECURITIES, LLC, ) | |
| MICHAEL MEAGHER, ) | |
| STEPHEN SMITH, ) | |
| MICHAEL MEYER, ) | |
| THE SEAPORT GROUP, LLC, ) | |
| ARMORY ADVISERS, LLC, ) | |
| ARMORY FUND, LP, ) | |
| SEAPORT V, LLC, and ) | |
| DOE COMPANIES 1-50, ) | |
| ) | |
| Respondents. ) | |

1. The undersigned parties ("parties") hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, and all related cross claims, counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the FINRA By-Laws, Rules, and Code of Arbitration Procedure.

2. The parties hereby state that they or their representative(s) have read the procedures and rules of FINRA relating to arbitration, and the parties agree to be bound by these procedures and rules.

3. The parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The parties further agree and understand that the arbitration will be conducted in accordance with the FINRA Code of Arbitration Procedure.

4. The parties agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement. The parties further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5. The parties hereto have signed and acknowledged the foregoing Submission Agreement.

_Drew Doscher_
Claimant Name (please print)

_[signature]_                                      6/24/2013
Claimant's Signature                               Date
State capacity if other than individual (e.g., executor, trustee or corporate officer)

# EXHIBIT C

FINANCIAL INDUSTRY REGULATORY AUTHORITY
DISPUTE RESOLUTION

DREW DOSCHER,

Claimant,

-against-

SEA PORT GROUP SECURITIES, LLC,
STEPHEN SMITH, MICHAEL MEAGHER,
MICHAEL MEYER, THE SEAPORT
GROUP LLC, ARMORY ADVISERS LLC,
ARMORY FUND LP, and  SEAPORT V
LLC,

Respondents.

THE SEAPORT GROUP LLC,

Counterclaimant,

-against-

DREW DOSCHER,

Counterclaim-Respondent.

Arbitration No. 13-01857

## Submission Agreement

1.    The undersigned parties ("parties") hereby submit the present matter in
controversy, as set forth in the attached statement of claim, answers, and all related cross claims,
counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with
the FINRA By-Laws, Rules, and Code of Arbitration Procedure.

2.    The parties hereby state that they or their representative(s) have read the
procedures and rules of FINRA relating to arbitration, and the parties agree to be bound by these
procedures and rules.

3.      The parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The parties further agree and understand that the arbitration will be conducted in accordance with the FINRA Code of Arbitration Procedure.

4.      The parties agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement.  The parties further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5.      The parties hereto have signed and acknowledged the foregoing Submission Agreement.

_____          8-29-13
Ronald G. Blum, Manatt, Phelps & Phillips, LLP          Date
*as Counsel for and on behalf of Respondents and Counterclaimant*
The Seaport Group LLC
Sea Port Group Securities, LLC
Seaport V LLC
Armory Advisors LLC
Armory Fund LLP
Michael Meagher
Stephen Smith
Michael Meyer

# EXHIBIT D



**Financial Industry Regulatory Authority**



1. **CASE INFORMATION:**

   A. CASE-NUMBER:  13-01857

   B. CASE-NAME:  Drew Jude Doscher vs. Sea Port Group Securities, LLC, Stephen Corcoran Smith, Michael Jefferson Meagher, et al.

   C. FINRA Dispute Resolution
      REPRESENTATIVE:  Arthur Baumgartner
      Case Administrator
      FINRA Dispute Resolution
      One Liberty Plaza
      165 Broadway, 27th Floor
      New York, NY 10006
      212-858-4200

   D. HEARING DATE:  November 15, 2013 at 01:00 PM Eastern Time Zone

   E. ADDITIONAL HEARING SESSIONS:
      Additional hearing session(s) are scheduled on: None

   F. HEARING LOCATION:
      Initial Pre-hearing Conference
      NY
      Conference Call Number: 1-800-779-9502 Passcode: 13-01857

2. **PARTY REPRESENTATIVE INFORMATION:**

   REPRESENTATIVE:
   Ronald G. Blum, Esq., Manatt Phelps Phillips
   Phone: 212-830-7186, Fax: 212-790-4545
   Email: rblum@manatt.com
   PARTY(IES):
   Armory Advisors, LLC, Respondent
   Armory Fund, LLP, Respondent
   Michael Jefferson Meagher, Respondent
   Michael John Meyer, Respondent
   Sea Port Group Securities, LLC, Respondent

Dispute Resolution
Northeast Regional Office

One Liberty Plaza
165 Broadway
27th Floor
New York, NY
10006-1404

t 212 858 4200
f 301 527 4873
www.finra.org

Seaport V, LLC, Respondent
Stephen Corcoran Smith, Respondent
The Seaport Group, LLC, Respondent

REPRESENTATIVE:
A. Todd Merolla, Esq., Merolla & Gold, LLP
Phone: 678-587-9500, Fax: 678-587-9098
Email: atm@merollagold.com
PARTY(IES):
Drew Jude Doscher, Claimant

3.    **ARBITRATION PANEL:**

| | | |
|---|---|---|
| Michele S. Riley | Public Arbitrator | Chairperson |
| David J. Pine | Non-Public Arbitrator | Panelist |
| Law Offices of David Pine | | |
| Robert Francis Littlejohn | Public Arbitrator | Panelist |
| RF Littlejohn & Associates | | |

*Arbitrator classification is reported in accordance with the Codes of Arbitration Procedure for Customer and Industry Disputes, Rules 12100(p) and (u) and 13100(p) and (u), respectively. For more information, please see Regulatory Notice 08-22.*

LC20B
idr: 10/05/2009

RECIPIENTS:
Ronald G. Blum, Esq., Sea Port Group Securities, LLC
Manatt Phelps Phillips, 7 Times Square, New York, NY 10036

Ronald G. Blum, Esq., Michael John Meyer
Manatt Phelps Phillips, 7 Times Square, New York, NY 10036

Ronald G. Blum, Esq., Stephen Corcoran Smith
Manatt Phelps Phillips, 7 Times Square, New York, NY 10036

Ronald G. Blum, Esq., Michael Jefferson Meagher
Manatt Phelps Phillips, 7 Times Square, New York, NY 10036

Ronald G. Blum, Esq., Seaport V, LLC
Manatt Phelps Phillips, 7 Times Square, New York, NY 10036

Ronald G. Blum, Esq., Armory Fund, LLP
Manatt Phelps Phillips, 7 Times Square, New York, NY 10036

Ronald G. Blum, Esq., Armory Advisors, LLC
Manatt Phelps Phillips, 7 Times Square, New York, NY 10036

Ronald G. Blum, Esq., The Seaport Group, LLC
Manatt Phelps Phillips, 7 Times Square, New York, NY 10036

A. Todd Merolla, Esq., Drew Jude Doscher
Merolla & Gold, LLP, 4828 Ashford Dunwoody Road, 2nd Floor, Atlanta, GA 30338

# EXHIBIT E



**FINLA**
Financial Industry Regulatory Authority



1.    **CASE INFORMATION:**

    A. CASE-NUMBER:  13-01857

    B. CASE-NAME:   Drew Jude Doscher vs. Sea Port Group Securities, LLC, Stephen Corcoran Smith, Michael Jefferson Meagher, et al.

    C. FINRA Dispute Resolution
       REPRESENTATIVE:   Arthur Baumgartner
                       Case Administrator
                       FINRA Dispute Resolution
                       One Liberty Plaza
                       165 Broadway, 27th Floor
                       New York, NY 10006
                       212-858-4200

    D. HEARING DATE:   June 9, 2014 at 09:30 AM Eastern Time Zone

    E. ADDITIONAL HEARING SESSIONS:
        Additional hearing session(s) are scheduled on:
        June 10, 2014, June 11, 2014, June 12, 2014, June 13, 2014, June 16, 2014, June 17, 2014.

    F. HEARING LOCATION:
        FINRA Dispute Resolution
        165 Broadway, 27th Floor
        One Liberty Plaza
        New York, NY 10006

2.    **PARTY REPRESENTATIVE INFORMATION:**

    REPRESENTATIVE:
        Ronald G. Blum, Esq., Manatt Phelps Phillips
        Phone: 212-830-7186, Fax: 212-790-4545
        Email: rblum@manatt.com
    PARTY(IES):
        Armory Advisors, LLC, Respondent
        Armory Fund, LLP, Respondent

Investor protection. Market integrity.

Dispute Resolution
Northeast Regional Office

One Liberty Plaza
165 Broadway
27th Floor
New York, NY
10006-1404

t  212 858 4200
f  301 527 4873
www.finra.org

Michael Jefferson Meagher, Respondent
Michael John Meyer, Respondent
Sea Port Group Securities, LLC, Respondent
Seaport V, LLC, Respondent
Stephen Corcoran Smith, Respondent
The Seaport Group, LLC, Respondent

REPRESENTATIVE:
A. Todd Merolla, Esq., Merolla & Gold, LLP
Phone: 678-587-9500, Fax: 678-587-9098
Email: atm@merollagold.com
PARTY(IES):
Drew Jude Doscher, Claimant

3.   **ARBITRATION PANEL:**

| | | |
|---|---|---|
| Michele S. Riley | Public Arbitrator | Chairperson |
| Kevin B. Naughten | Non-Public Arbitrator | Panelist |
| Robert Francis Littlejohn | Public Arbitrator | Panelist |
| RF Littlejohn & Associates | | |

*Arbitrator classification is reported in accordance with the Codes of Arbitration Procedure for Customer and Industry Disputes, Rules 12100(p) and (u) and 13100(p) and (u), respectively. For more information, please see Regulatory Notice 08-22.*

LC20B
idr: 10/05/2009

RECIPIENTS:
Ronald G. Blum, Esq., Sea Port Group Securities, LLC
Manatt Phelps Phillips, 7 Times Square, New York, NY 10036

Ronald G. Blum, Esq., Michael John Meyer
Manatt Phelps Phillips, 7 Times Square, New York, NY 10036

Ronald G. Blum, Esq., Stephen Corcoran Smith
Manatt Phelps Phillips, 7 Times Square, New York, NY 10036

Ronald G. Blum, Esq., Michael Jefferson Meagher
Manatt Phelps Phillips, 7 Times Square, New York, NY 10036

Ronald G. Blum, Esq., Seaport V, LLC

Manatt Phelps Phillips, 7 Times Square, New York, NY 10036

Ronald G. Blum, Esq., Armory Fund, LLP
Manatt Phelps Phillips, 7 Times Square, New York, NY 10036

Ronald G. Blum, Esq., Armory Advisors, LLC
Manatt Phelps Phillips, 7 Times Square, New York, NY 10036

Ronald G. Blum, Esq., The Seaport Group, LLC
Manatt Phelps Phillips, 7 Times Square, New York, NY 10036

A. Todd Merolla, Esq., Drew Jude Doscher
Merolla & Gold, LLP, 4828 Ashford Dunwoody Road, 2nd Floor, Atlanta, GA 30338